**CONSOLIDATED RAIL CORPORATION,**
Plaintiff,

v.

**NEVINS–PETRILLO WAREHOUSE & DISTRIBUTION SYSTEMS, INC., and Jeffrey Nevins, Defendants.**

**No. 79 Civ. 2588 (HFW).**

United States District Court, S.D. New York.

June 1, 1983.

Michael J. Siris, New York City, for Conrail.

Arthur Liberstein, P.C., New York City, for Nevins-Petrillo.

## MEMORANDUM DECISION

HENRY F. WERKER, District Judge.

Plaintiff Consolidated Rail Corporation (Conrail) commenced this action under the Interstate Commerce Act to recover demurrage and related transportation charges from defendant Nevins-Petrillo Warehouse & Distribution Systems, Inc. (Nevins-Petrillo). Nevins-Petrillo is a New York corporation engaged in the business of unloading, warehousing and distributing freight moved by rail. During the period relevant to this action, Nevins-Petrillo owned and operated a warehouse which was adjacent to Conrail's Harlem River/Oak Point railroad yards in the Bronx, New York. Conrail contends the charges accrued under duly filed tariffs during certain months of 1977, 1978 and 1979.

A bench trial was held on April 19 and 20, 1983. At the close of the trial, the court dismissed the third-party complaint against third-party defendant Armel Ice Cream Company, Inc. (Armel), and directed Conrail and Nevins-Petrillo to submit proposed findings of fact and conclusions of law by May 20, 1983.

The court has considered the exhibits received in evidence, the testimony of the witnesses, the trial transcript, and memoranda of law submitted by the parties. It finds that Conrail is entitled to recover demurrage charges in the amount of $130,410.

The following constitute the court's findings of fact and conclusions of law.[1]

### I.

1. Prior to the delivery of the rail shipments which are the subject of this action, Nevins-Petrillo asked Conrail to grant it credit to cover the payment of transporta-

---

**1.** Findings of fact 1 through 13 closely follow the agreed facts set forth in the pretrial order.

tion charges which would arise in connection with Conrail deliveries to the Nevins-Petrillo warehouse. By letter dated November 19, 1976 (exhibit 1 in evidence), Conrail forwarded to Nevins-Petrillo for completion blank copies of the Demurrage Average Agreement Application, Credit Application, and Guaranty form.

2. In December 1976, Nevins-Petrillo submitted to Conrail its completed "Application for Settlement of Car Demurrage Charges under the Average Agreement Plan." (exhibit 2 in evidence). The application was signed by Jeff Nevins, president of Nevins-Petrillo. This application and the Average Agreement Plan for payment of demurrage charges both conformed to Freight Tariff 4–K (exhibit 5 in evidence) which was in effect at that time. Item 850 of Tariff 4–K provides that such an agreement becomes effective on the first day of the month following receipt of the application by the railroad.

3. Together with the above-referenced application, Nevins-Petrillo also executed and submitted the written guaranty (exhibit 3 in evidence) wherein it guaranteed to pay to Conrail all demurrage charges which accrued under the terms of the Average Agreement, on any and all of the Conrail cars delivered to the Nevins-Petrillo warehouse or shipped out of said warehouse, without regard to whether such cars or shipments were consigned to Nevins-Petrillo. The guaranty was was also signed by Jeff Nevins, president of Nevins-Petrillo, and attested to by Carl Petrillo, vice-president and secretary-treasurer of Nevins-Petrillo.

4. After receipt of the completed application and guaranty, Conrail granted the request for credit and later billed Nevins-Petrillo for demurrage charges in accordance with the Average Agreement method. Under the Average Agreement Plan, instead of paying demurrage charges on a per-car basis, (straight demurrage), charges for the month are accumulated and credit is given to the customer for cars which are released early. One bill is then rendered at the end of the month for all the net charges accumulated during that month.

5. Prior to the issuance of the monthly demurrage bills for the charges which are the subject of this suit, Nevins-Petrillo had, on several occasions, paid demurrage bills which were rendered under the Average Agreement.

6. Prior to the rail deliveries which form the basis of this lawsuit, Nevins-Petrillo submitted a contract bid to the New York City Board of Education, Bureau of Supplies, to provide handling and storage services for rail shipments to the Bureau. A condition of that contract was that demurrage and related charges would be the responsibility of the contractor. After submission of its bid, Nevins-Petrillo entered into this contract with this agency; a portion of the shipments included in the present action came under this contract.

7. On January 9, 1979, Nevins-Petrillo signed a agreement with Armel regarding payment of demurrage charges. (exhibit 17 in evidence). The agreement provided in relevant part:

"It is agreed and acknowledged between Armel Warehouse Co. and Nevins-Petrillo Warehouse & Dist. Co. that Armel is not liable for demurrage and detention and all other charges including freight for those [United States Department of Agriculture] cars that have been placed by Conrail at the Harlem River Station and the Nevins-Petrillo siding or any such siding assigned by Nevins-Petrillo. Notification of arrival of cars arrives at Nevins-Petrillo and it is [Nevins Petrillo's] responsibility to unload cars for Armel as agreed. This agreement has been in effect since December 12, 1976 ..."

8. After the execution of the aforesaid agreements, and during the years of 1977, 1978 and 1979, Nevins-Petrillo received at its warehouse, from Conrail, incoming railroad cars consigned to various entities but to the "care of" Nevins-Petrillo at its Harlem River/Oak Point facility.

9. Under Item 610 of Freight Tariff 4–K the party responsible for the demur-

rage/detention charges, in order to avoid the charges, must unload and release incoming rail cars to the railroad within a certain free time period after the time that notification of the arrival of the car is given by the railroad to that party.

9a. Pursuant to Items 800 *et seq.* of Tariff 4–K, Conrail prepared and forwarded to Nevins-Petrillo copies of the Monthly Demurrage Audit Statements (MDAS) and the corresponding Statement of Demurrage Charges for certain months of 1977, 1978 and 1979 for which the demurrage charges accrued. *See* Exhibits 25 through 64 in evidence. The total amount demanded in these statements was $130,410 (which includes a $1,490 correction).

10. Nevins-Petrillo has refused payment of all charges demanded by Conrail.

11. Nevins-Petrillo never requested written notice of the arrival of rail cars.

12. Since Armel did not have a warehouse along the rail-siding at Oak Point, it was required to contract out to Nevins-Petrillo to unload cars when they arrived at the Oak Point Yard.

13. By agreeing to unload the cars at Oak Point, Nevins-Petrillo became a "take-care" consignee for all shipments designated to the State of New York.

14. Under its agreement with Armel (exhibit 17 in evidence), Nevins-Petrillo implied that it was liable for demurrage/detention and all other charges on United States Department of Agriculture (USDA) cars that had been placed by Conrail at, among other locations, the Conrail Harlem River Station. Transcript at 127–128.

15. During certain months of 1977, 1978 and 1979, Nevins-Petrillo failed to unload and release a number of rail cars within the applicable time limits, thereby causing demurrage charges to accrue under Tariff 4–J or 4–K depending on the date of demurrage. Freight Tariff 4–J (effective April 1, 1973) in evidence as exhibit 4 and Freight Tariff 4–K (effective July 1, 1977) in evidence as exhibit 5. *See also* exhibits 25–64 in evidence.

16. In early 1979, the back-up of railcars for the account of Nevins-Petrillo increased to such an extent that Conrail, upon the recommendation of the New York City Regional Office of the Interstate Commerce Commission (ICC), imposed an embargo on the Nevins-Petrillo warehouse. Transcript at 33–38, 60. *See also* October 27, 1982 deposition of Thomas Gariepy, exhibit 1 for identification; January 5, 1983 deposition of Thomas Gariepy at 116.

17. The demurrage charges due Conrail amount to $130,410. *See* exhibits 25–64 in evidence.

18. The information on each of the Monthly demurrage Audit Statements for Nevins-Petrillo contains, *inter alia*, car number, contents and the dates and times of arrival, notices of arrival, ordering, placement and release. This information was originally entered directly onto an IBM computer or Demurrage and Industrial Card Control System (DICCS) card. Transcript at 12. A DICCS cars was prepared for every car which arrived at the Harlem River/Oak Point Yard. Transcript at 11–18.

19. The information was entered onto the card by the Conrail Car Control DICCS clerk as each step (arrival, notice, etc.) occurred. After completion of the cards, the information thereon was forwarded to Conrail's central computer in Philadelphia where the Monthly Demurrage Audit Statement and the Statement of Demurrage Charges were prepared. These statements were sent to Nevins-Petrillo on the fifteenth day of each month. Transcript at 17, 24–28.

20. Each entry of the date and time of notification on the MDAS indicates that telephone notification of the arrival of that car was given to Nevins-Petrillo on that date as permitted under Item 1345 of Tariff 4–K. In addition, if, as a precaution and courtesy, Conrail simultaneously sent to Nevins-Petrillo constructive placement notices, then the time of notification would be indicated as "1700" which is military time for 5:00 p.m. Transcript at 52.

21. In addition to telephone notification and although not required under the Tariff, written constructive placement notices were sent to Nevins-Petrillo for a certain number of the cars. Transcript at 32, 52, 66, 72. *See* exhibit 67 in evidence consisting of 188 notices of constructive placement. Constructive placement is defined at Item 545 of Freight Tariff 4–K as occurring "when a car consigned or ordered to a private track ... cannot be actually placed because of a condition attributable to the ... consignee ...." In such instances, the car may be held at destination and "notice shall be sent or given ...." Conrail had an established procedure for mailing notices of constructive placement. Transcript at 68, 72, 161. These notices informed Nevins-Petrillo of the number of the car that Conrail was holding.

22. Nevins-Petrillo did not have a system for noting receipt of notices of constructive placement, and, such notices were discarded when received by Nevins-Petrillo. Transcript at 126.

23. For the nineteen working days during the period from November 13, 1978 through December 8, 1978, 56 railroad cars were released as empty by Nevins-Petrillo, for an unloading average of 3 cars per day. 10/27/82 Gariepy dep., exhibit 1 for identification.

24. During the period from November 13, 1978 through December 8, 1978, Conrail provided Nevins-Petrillo with two switches per day which would have enabled Nevins-Petrillo to unload six cars per day. 10/27/82 Gariepy dep., exhibit 1 for identification; Transcript at 33.

25. In mid December 1978, fifty-five railcars were awaiting unloading at Conrail's Oak Point Yard for the account of Nevins-Petrillo with a total number of 666 demurrage days on those cars. 10/27/82 Gariepy dep., exhibit 1 for identification. Transcript at 33–34, 39.

26. On January 10, 1979, Conrail issued an embargo to regulate the number of railcars arriving at the Nevins-Petrillo Warehouse. The embargo was designed to reduce the backup of railcars for the account of Nevins-Petrillo. Transcript at 33–34, 39.

27. As of February 16, 1979, thirty railcars remained on hand at Conrail's Oak Point Yard for unloading for the account of Nevins-Petrillo. 10/27/82 Gariepy dep., exhibit 5 for identification.

28. With the exception of one letter which was not offered in evidence at the trial, Nevins-Petrillo never made any written complaints to Conrail regarding allegedly inadequate notice of availability of cars. Transcript at 128–130.

29. Nevins-Petrillo never complained to the ICC's Thomas Gariepy, during his investigation of the backlog of cars at Oak Point, that Conrail was not affording it proper notification of arrival of cars. December 17, 1982 Gariepy dep. at 51; January 5, 1983 Gariepy dep. at 96.

30. Nevins-Petrillo contends that it did not receive proper notification of arrival of cars "266843" and "31337". Transcript at 59. These cars are listed on the notice of constructive placement dated February 12, 1979. Nevins-Petrillo was not able to say that it did not receive constructive placement notices for the four to five cars for which notice purportedly was not given. Transcript at 134–135. Although Carl Petrillo disputed a particular demurrage bill because notice of arrival was given to Larry at Fiorello (transcript at 110), at that time Fiorello was helping Nevins-Petrillo in the removal of the cars that had accumulated at the Oak Point Yard.

31. The ICC, through Thomas Gariepy, was aware of Conrail's DICCS computer system. 1/5/83 Gariepy dep. at 114–115.

32. The ICC was familiar with Conrail's Monthly Demurrage Audit Statement. It was Mr. Gariepy's opinion that the ICC approved of the monthly audit statements. 1/5/83 Gariepy dep. at 119, 122.

33. Carl Petrillo and Jeff Nevins informed Thomas Gariepy that they would try to "get their act together ..." with respect to clearing up the backlog of cars that had accumulated for their account at

Conrail's Oak Point Yard. 1/5/83 Gariepy dep. at 104.

34. Raymond Olson testified that at no time during the period in question did he or any of the clerks under his supervision at Oak Point receive complaints from any patrons regarding improper notification of arrival. Transcript at 162. During the period involved in this action, Nevins-Petrillo did not complain to Conrail's Mr. Olson or any of the 20 clerks under his control that it was not getting proper notification of arrival. Transcript at 30–31.

35. If a patron wants written notification of arrival, the patron must make a written request to the railroad. Item 1350 of Tariff 4–K does not prevent the railroad from sending written notice of arrival. In any event, written notice of constructive placement (as opposed to written notice of arrival) is allowed under Item 1305 of the Tariff.

36. During the period in suit, the Conrail clerks at Oak Point were under instructions to notify Nevins-Petrillo when cars arrived for the USDA or Armel. Transcript at 69–70.

37. Pursuant to Item 1345(4) of Tariff 4–K, actual delivery may constitute notice of arrival. Though not a normal practice, Conrail used actual delivery as a form of notice when a patron/consignee had room for delivery. Transcript at 57.

38. During the period in question, the ICC's Thomas Gariepy was certain that Nevins-Petrillo was aware of the backlog of cars that had accumulated at the Oak Point Yard for its account. 12/17/82 Gariepy dep. at 41.

39. Mr. Gariepy believed the reason for the backlog of cars for the account of Nevins-Petrillo was that "too many cars were being shipped too soon by too many people ..." 12/17/82 Gariepy dep. at 44. The purpose of the embargo was to prevent Nevins-Petrillo from receiving more cars at the Oak Point yard than it could handle, thereby securing the prompt release of railroad equipment then in short supply. 12/17/82 Gariepy dep. at 50.

II.

49 U.S.C.A. § 10761(a) (Supp.1982) of the Interstate Commerce Act provides in relevant part:

[A] carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission under chapter 105 of this title shall provide that transportation or service only if the rate for the transportation or service is contained in a tariff that is in effect under this subchapter. That carrier may not charge or receive a different compensation for the transportation or service than the rate specified in the tariff whether by returning a part of that rate to a person, giving a person a privilege, allowing the use of a facility that affects the value of that transportation or service, or another device.

A tariff confers rights and imposes duties as a matter of law. The cases hold that freight charges assessed in accordance with duly filed tariffs have the force of law and must be collected in full. *Illinois Central Gulf R. Co. v. Golden Triangle Wholesale Gas Co.*, 586 F.2d 588, 592 (5th Cir.1978); *In re Penn Central Transportation Co.*, 477 F.2d 841, 844 (3d Cir.), *aff'd sub nom., United States Steel Corp. v. Trustees of Penn Central Transportation Co.*, 414 U.S. 885, 94 S.Ct. 231, 38 L.Ed.2d 137 (1973).

Demurrage has been defined as "a daily rate charged by a railroad to a consignee (such as defendant) on each railroad car which the consignee fails to unload within a certain time after the car has been either actually or constructively placed by the railroad at the consignee's disposal for unloading." *Illinois Central Railroad Co. v. Ready-Mix Concrete, Inc.*, 323 F.Supp. 609, 610 (E.D.La.1971). In *City of New Orleans v. Southern Scrap Material Co.*, 491 F.Supp. 46, 48 (E.D.La.1980), the district court stated:

Demurrage is properly assessed in accordance with the terms of a tariff even though the detention occurs through no fault of the consignee, for a cause that is

beyond the consignee's control .... The assessed party may be relieved of liability only if (1) a specific provision of the tariff exonerates the consignee from liability for demurrage; (2) the delay is the fault of the carrier or those for whom it is responsible; or (3) the delay is casused by a vis major. (citations omitted)

The General Car Demurrage Tariffs (Freight Tariffs 4–J, 4–K and the relevant supplements) which applied to the various shipments involved in this action set forth the rules which govern the relationship between the carrier and the consignee (or any other person responsible for the demurrage charges). Item 610 of Freight Tariff 4–K provides that "[f]ree time will be computed from the first 7:00 a.m. after placement or after proper notification has been sent or given where required." Item 1345 of Tariff 4–K provides methods and procedures for notification. "Notification may be sent or given: (1) In writing by U.S. Mail or otherwise. (2) By personal or telephone communication. (3) By action of the consignee (see item 1360). (4) By delivery of cars upon other than public delivery tracks or industrial interchange tracks serving consignee or consignor." *See* Exhibit 5.

At the trial, Conrail demonstrated that each railcar upon which the demurrage charges accrued was properly placed (either actual placement or constructive placement), and that proper notice of arrival was given to Nevins-Petrillo for each car. Notice was given by telephone and, in many instances, by both telephone and writing. Records of the telephone notice were made at the time notice was given and the information reflected in these records was forwarded to Conrail's central computer in Philadelphia where the monthly demurrage audit statement and the statement of de-

murrage charges were automatically prepared and sent to Nevins-Petrillo on the fifteenth day of each month. Under Conrail's recordkeeping procedures, no handwritten records are available for the demurrage charges sought in this lawsuit. The "DICCS" cards upon which the relevant information was entered no longer exist. Conrail produced at trial the computer printouts which contain the pertinent information for computation of demurrage (notice, placement, and release dates). It showed that such information was reliably entered into the computer system from the original field documents.

■ The general rule is that a consignee is not responsible for demurrage "where the delay is the fault of the carrier or those for whom he is responsible...." *See Pennsylvania Railroad Co. v. Moore-McCormack Lines, Inc.*, 370 F.2d 430, 432 (2d Cir.1966). Here, it was Nevins-Petrillo's failure to timely unload and release the railcars which led to the accrual of the demurrage charges and imposition of the embargo upon its warehouse. The contention by Nevins-Petrillo that the delay was the fault of Conrail is without merit.

The demurrage charges demanded by Conrail were assessed in accordance with duly filed tariffs and, accordingly, should be collected in full. Conrail documented its claim for the unpaid demurrage charges. With the exception of the names of the persons giving and receiving notification, Conrail's monthly demurrage audit statements contain the information prescribed by the Interstate Commerce Commission's record-keeping regulations, 49 C.F.R. Part 1254[2]. These regulations were repealed by the ICC on December 20, 1982. ("The Commission has determined that the rules

**2.** 49 C.F.R. § 1254.03(d) provides as follows: "Notification of arrival, actual placement, or constructive placement. Notification of arrival, actual placement, or constructive placement shall be given in writing by the carrier to the shipper or consignee with a copy thereof retained by the carrier. If by tariff exception a carrier provides for telephone notification of arrival, actual placement, or constructive placement of cars instead of written notification, the carrier shall maintain a record of the said telephone notification which shall include the following information: (1) Name of the carrier's employee giving such notification; (2) Name of the shipper of consignee receiving such notification; (3) Name of the shipper's or consignee's employee receiving the notification; (4) Car initial and number; (5) Date and time notification is given the shipper or consignee."

at 49 C.F.R. 1254, pertaining to the maintenance of demurrage and detention records, are unnecessary. The Commission is removing these rules. The removal ... will be effective on January 31, 1983.") (*See* ICC Ex Parte No. 285).

Further, Conrail produced 188 copies of written notices of constructive placement and testimony on the procedures for mailing these notices. (Exhibit 67 in evidence).

Carl Petrillo testified that Nevins-Petrillo received notice from Conrail of the availability of cars generally by telephone call or by actual placement of the car. Transcript at 96. He stated he learned in January 1979 that a substantial number of cars consigned to Nevins-Petrillo's order were in Conrail's yard. He then made arrangements to place the cars with Fiorello warehouse. 20 to 30 cars were in fact placed with Fiorello. Petrillo testified that he did not receive telephone notice or constructive placement notice of the availability of the cars placed with Fiorello. He also testified that he didn't receive notice with respect to 81 of Armel's cars. The only notice he claims he received on the 81 Armel cars was the actual placement of the cars. Transcript at 97–102. Referring to exhibits 59 and 60, Petrillo cited several instances where Conrail purportedly failed to provide notification to Nevins-Petrillo. Transcript 106–117.

Mr. Petrillo's testimony was somewhat incredible in light of the fact that at page 135 of the transcript he testified that his company maintained records of the telephone notification it received from Conrail. He said that these records presently exist but were not supplied to Conrail. The records were not produced during discovery or at the trial. Transcript 135–140.

■ Where a party fails to produce material evidence in its control, the court may infer that the evidence is unfavorable to that party. The inference can be rebutted by an adequate explanation for non-production. *Tupman Thurlow Co., Inc. v. S.S.*

*Cap Castillo*, 490 F.2d 302, 308 (2d Cir. 1974). Although asked during pretrial discovery to produce any business records evidencing the dates of arrival, notification, etc. of the cars which are the subject of this action, Carl Petrillo stated for the first time at trial that such records existed, had not been furnished to Conrail and were still at the Nevins-Petrillo warehouse. (Transcript at 139, 146–147). The trial testimony of Carl Petrillo concerning the existence of these documents flatly contradicted his deposition testimony. The failure to produce these documents leads the court to infer that the documents are unfavorable to Nevins-Petrillo. There was no satisfactory explanation for their non-production.

The documentary evidence, the testimony of Raymond Olson, and the pertinent portions of the deposition of Thomas Gariepy refute Mr. Petrillo's assertion of lack of notice to Nevins-Petrillo of availability of cars.

With respect to the counterclaims asserted against Conrail by Nevins-Petrillo, no proof was offered at trial by Nevins-Petrillo of any damages. The counterclaims are dismissed for failure of proof. As noted earlier, the inability of Nevins-Petrillo to unload and release the railcars which came into its warehouse within the time limits established under the tariff led to the backup of cars and the ensuing embargo.

Nevins-Petrillo has argued that it did not receive the required arrival notice for the railcars. However, with the exception of this argument, which the court has rejected, Nevins-Petrillo has not contested, either at trial or in its proposed findings, the calculation of the demurrage charges by Conrail. Nevins-Petrillo does not argue that the amounts arrived at by Conrail through the use of Conrail's notice, placement and release dates are incorrect. Conrail is due $130,410 in demurrage charges.

The court finds that Conrail has not sustained its burden of proof with respect to the Rule 725 [3] and Rule 6I [4] charges. Con-

---

**3.** Rule 725 charges apparently are special charges for mechanical refrigeration railcars.

Conrail seeks Rule 725 charges in the amount of $33,142.44. However, disputed exhibit 77 listed

**4.** See note 4 on page 907.

rail failed to adequately demonstrate the purpose, nature and application of these charges. The evidence submitted in support of these charges is unclear and ambiguous and there is not sufficient information for the court to make a finding. Accordingly, Rule 725 and Rule 6I charges are not awarded.

In accordance with the above, Conrail is awarded demurrage charges in the amount of $130,410. Conrail is directed to submit a judgment on notice within 15 days after entry of this decision.

SO ORDERED.

in the pretrial order rule was not received in evidence. This exhibit specifies $4,934.99 in Rule 725 charges.

4. Rule 6I charges apparently are some type of special detention charge assessed in connection with shipments shipped at a lower than normal freight rate.