**Marius LIGI, Plaintiff,**

v.

**REGNERY GATEWAY, INC. and Aristede Buhoiu, Defendants.**

**No. CV–88–0224.**

United States District Court, E.D. New York.

June 24, 1988.

---

**160**

Lawrence Vincent Kelly, New York City, for plaintiff.

Radu Herescu, Andrew J. Goodman, Rosner & Goodman, New York City, for defendants.

1. Although plaintiff raises other cause of actions the issues to be addressed on this motion pertain to the breach of contract.

2. A stateless person is not a citizen or subject of a foreign state within the meaning of 28 U.S.C. § 1332(a)(2), *Shoemaker v. Malaxa,* 241 F.2d 129 (2d Cir.1957) and See *Mas v. Perry,* 489 F.2d 1396 (5th Cir.1974) "complete diversity of

## MEMORANDUM AND ORDER

COSTANTINO, District Judge.

Plaintiff, a citizen of New York, instituted this civil action in diversity for breach of contract.[1] Defendant Regnery Gateway Inc., (Regnery), is a corporation existing under the laws of Illinois and Defendant Aristide Buhoiu is a native Romanian currently residing in New York.

Defendants have now moved for dismissal of this suit pursuant to Fed.R.Civ.P. 12(b)(1), lack of subject matter jurisdiction and Fed.R.Civ.P. 12(b)(2), lack of *in personam* jurisdiction. Defendants claim that Buhoiu is a stateless person, a fact that would destroy the requisite complete diversity,[2] and Regnery, a corporation, does not "transact any business" in New York. This court concludes for the reasons that follow that Buhoiu is a Romanian citizen and Regnery does "transact ... business" within this jurisdiction. As such, defendant's motion to dismiss is hereby denied.

## I. SUBJECT MATTER JURISDICTION

28 U.S.C. § 1332 grants district courts jurisdiction of all civil actions where the "matter in controversy ... is between citizens of a State and citizens ... of a foreign state." The party seeking to invoke the court's subject matter jurisdiction has the burden of proving that diversity of citizenship exists. *Thomson v. Gaskill,* 315 U.S. 442, 446, 62 S.Ct. 673, 675, 86 L.Ed. 951 (1941); *Topp v. Compair Inc.,* 814 F.2d 830, 839 (1st Cir.1987). Thus, the plaintiff in this case must prove that as of the filing of this lawsuit defendant Bohoui was a citizen of a foreign state.[3]

### A. *Plaintiff's Burden*

■ There is a presumption that citizenship established at birth continues to the present. *Hauenstein v. Lynham,* 100 U.S. (10 Otto) 483, 25 L.Ed. 628 (1879); *United*

parties is required in order that diversity jurisdiction obtain."

3. Domicile, for purposes of jurisdictional questions, is determined at the time a lawsuit is commenced. See, *Willis v. Westin Hotel Co.,* 651 F.Supp. 598, 601 (S.D.N.Y.1986).

*States, Barilla v. UHL, District Director of Immigration & Naturalization at Port of New York*, 27 F.Supp. 746; 747 (S.D.N.Y. 1939). Absent sufficient evidence to the contrary, Buhoiu's Romanian citizenship, established at birth, continues to the present time. See, *Blair Holding Corp. v. Rubinstein*, 133 F.Supp. 496, 499 (S.D.N.Y. 1955); *RCA Records, A Division of RCA Corp v. Hanks*, 548 F.Supp. 979, 982 (S.D. N.Y.1982) (defendant submitted enough evidence to overcome the presumption that his Dutch citizenship, established at birth, continues to the present time). Plaintiff's claim that Buhoiu is a Romanian citizen is based on a long standing inherent presumption and the following additional evidence submitted to this court: An affidavit by Mr. Nash, an attorney who has practiced law in Romania for thirteen (13) years and has actively been engaged in the practice of immigration law since 1968, and A Memorandum and Order of the Honorable Joseph M. McLaughlin.

■ (1) Mr. Nash details the mandatory procedures established by the Romanian Government to effectuate a revocation of citizenship. For Buhoiu to have effectively revoked his Romanian citizenship he would have had to complete an application,[4] file it with the Romanian Embassy in the United States, pay a filing fee for its processing and await a response from the Romanian Government (approximately 15 months). A Presidential Decree published by the Romanian Government would then be issued containing the approval of the renunciation. Until such publication is issued, revocation of citizenship would not be complete.

Defendant however, relies solely on his intention to renounce his citizenship and his voluntary expatriation from Romania in or-

der to establish his stateless status. It is, however, the inherent right of every independent nation to determine for itself, according to its own constitution and laws, who is to be entitled to its citizenship. *United States v. Wongkim Ark*, 169 U.S. 649, 668, 18 S.Ct. 456, 464, 42 L.Ed. 890 (1898); *Medvedieff v. Cities Service Oil, Co.*, 35 F.Supp. 999, 1002 (S.D.N.Y.1940). Thus, it is Romania's policy which governs the determination of citizenship, a policy which has been detailed by Mr. Nash and uncontradicted by the defendants.[5] See *DeLong v. Washington Mills*, 840 F.2d 843, 845 (11th Cir.1988) (District Court must construe allegations as true to the extent they are uncontroverted). As such, this court determines that Mr. Buhoiu has failed to abide by Romania's policy governing renunciation of citizenship and therefore remains a citizen of Romania.

■ (2) The Memorandum and Order of the Honorable Joseph M. McLaughlin submitted by plaintiff is dated November 10, 1987. That decision was in reference to an action separate to the present case and where Mr. Buhoiu was the plaintiff. Acting in that capacity, Buhoiu submitted an affidavit to the Honorable Judge dated October 27, 1986, stating that he was a Romanian citizen. Assuming that affidavit to be true [6], that on October 27, 1986, Buhoiu was a Romanian citizen, by the commencement of this action in January, 1988, Buhoiu could not have become a stateless person.[7]

Furthermore, it seems rather suspicious that in October, 1986, Mr. Buhoiu submits an affidavit stating he is a Romanian citizen which allows him the benefits of federal jurisdiction and in January, 1988, he submits an affidavit declaring his stateless

---

**4.** Defendant's sole submission of evidence pertaining to the revocation procedure is a copy of the application partially completed.

**5.** It is our contention that plaintiff has fulfilled his burden of proof by submitting the affidavit detailing the required standard. It is not required that plaintiff prove Buhoiu has not followed the prescribed procedures. See, *Campbell v. United States* (1961) 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428 ("on the consideration of fairness we cannot place the burden on a liti-

gant of establishing facts particuarly within the knowledge of his adversary.") If Buhoiu did in fact follow the procedure it is his burden to prove such to this court.

**6.** We are not deciding on the truth of such affidavit.

**7.** It has been established that it takes approximately 18 months to revoke a Romanian citizenship. See Nash Affidavit. October, 1986 to January, 1988 does not constitute 18 months.

status which, if accepted, would allow him the benefit of avoiding federal jurisdiction. Although the motive for changing one's citizenship is immaterial for jurisdictional purposes, *Peterson v. Allcity Insurance Co.*, 472 F.2d 71 (2d Cir.1972), a change in citizenship status for the purposes of avoiding federal jurisdiction will not be allowed [especially] when it is after the commencement of an action. Thus, I find that if in fact Mr. Buhoiu renounced his Romanian citizenship he did so after the commencement of this action and therefore he may not contest the subject matter jurisdiction of this court.

## II. IN PERSONAM JURISDICTION

In determining a federal court's personal jurisdiction over a defendant in a diversity action the laws of the court's forum state must be applied. See, *United States v. First National City Bank*, 379 U.S. 378, 381–82, 85 S.Ct. 528, 530, 13 L.Ed.2d 365 (1964); *Braman v. Mary Hitchcock Memorial Hospital*, 631 F.2d 6, 7 (2d Cir.1980). New York State Civil Practice Law and Rules states:

§ 302. Personal jurisdiction by acts of non-domiciliaries.

(a) acts which are the basis to jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

1. transacts any business within the state or contracts anywhere to supply goods or services in the state.

This section was promulgated to take advantage of New York's new constitutional power subjecting non-residents to personal jurisdiction. This power was derived from *International Shoe Co. v. State of Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) and its progeny, which held that "the commission of some single or occasional act ... in a state may be enough to render a person amenable to local suit or cause of action which arises out of or [is] connected with the activities within the state." See, *Simonson v. International Bank*, 14 N.Y.2d 281, 251 N.Y.S.2d 433, 200 N.E.2d 427 (1964). The Supreme Court in *Hanson v. Denkla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), in furthering the idea that non-residents may be subjected to personal jurisdiction, added the prerequisite of minimal contact: "however minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the minimal contacts with that state that are a prerequisite to its exercise of power over him."

The application of § 302(a)(1) requiring that a person who transacts any business in New York is to be subjected to its jurisdiction will vary with the quality and nature of each defendant's activity. It is, however, essential in each case that the defendant be engaged in some non-minimal act which envokes the benefits and protections of the state and that these acts "bear a substantial relationship to the transaction out of which the instant cause of action arose." See, *Hanson*, 357 U.S. at 253, 78 S.Ct. at 1239; *International Shoe*, 326 U.S. at 319, 66 S.Ct. at 159.

### A. *Defendant's Activities*

■ Defendant Regnery is a corporation engaged in the business of publishing books. Its principle places of business are Illinois and Washington, D.C. In 1987, Regnery published *Red Horizon* which was distributed throughout the United States by Kampmann & Company [8]. The relationship between Regnery and Kampmann is governed by a written agreement which states in part:

6.4 PUBLISHER (RGI) agrees to print the following information on the copyright page and the back cover of each trade title printed after the date of this Agreement:

Distributed to the Trade by:
Kampmann & Co., Inc.
New York, New York

---

**8.** In the Notice of Motion to Dismiss defendant states that "RGI's books are distributed through Kampmann & Co." In the absence of contrary evidence, we will assume *Red Horizon* to be included in such distribution arrangements.

The publishing of *Red Horizon* by Regnery and its distribution by Kampmann led to plaintiff's interest in obtaining the book's Romanian language rights. Negotiations between plaintiff, from his New York address, and Regnery ensued via telephone and mail. On December 2, 1987, the parties met in Washington and the next day defendant, Regnery, sent a letter with an agreement to Ligi. The letter was addressed to Mr. Ligi at his Astoria, New York address and stated in part:

> I am enclosing an agreement which will, when it is signed, give you the exclusive right to serialize *Red Horizon*, by Ion Mihai Pacepa, in the Romanian language, in the United States in your newspaper, Mico Magazin.

The agreement stated:

> Agreement dated this _____ day of December, 1987 by and between Regnery Gateway Inc. (Regnery) 1130 17th Street N.W. Washington, D.C. 20036, party to the first part, and _____ Legis and Micro Magazi (Legi) 30–83 42nd Street, Astoria, New York, New York 11103, party to the second part ...

Applying New York State Civil Practice Law & Rules § 302(a)(1) to defendant's activities, it is clear to this Court that defendant's actions were non-minimal and bore a substantial relationship to plaintiff's cause of action. Defendant Regnery contracted with a New York company to distribute one of its books which led a New York magazine into negotiations for its rights. These negotiations formed a contract to be effectuated upon signature (signing taking place in New York) and it is the breach of this contract on which plaintiff bases his cause of action.

Although defendant relies heavily on *Galgay v. Bulletin Company, Inc.*, 504 F.2d 1062 (2d Cir.1974) the cases are distinguishable on the most basic fact. In *Galgay*, the defendant was a Pennsylvania corporation and contracted with a New York Manufacturer for the purchase of certain machinery. The items were to be manufactured in New York and then shipped to Pennsylvania. The only contact that the defendant had with New York was the fleeting presence of the trucking sub-contractor. This contact was ancillary and peripheral to the business primarily being transacted. *Galgay* at 1067. In the present case, Regnery's actions in New York are not "fleeting". There was an on-going relationship between the defendant corporation and the New York distributor. Although the distributor was not the plaintiff, there exists a nexus between defendant's transactions and plaintiff's cause of action. This nexus warrants a finding that the contacts between defendant Regnery and New York are substantial.

In viewing the totality of circumstances in the instant case, the Court holds that defendant Regnery does transact business in New York as provided for in § 302 of the NYCPLR, and as such this Court has *in personam* jurisdiction.

Therefore, for the reasons articulated above plaintiff's motion to dismiss is hereby denied.[9]

SO ORDERED.

---

9. The Court appreciates and acknowledges the scholarly research of Rachel Yosevitz, Cardozo Law School Intern, in regard to the drafting of this decision.