The BANK OF CRETE, S.A., Plaintiff,

v.

George KOSKOTAS, Kathy Koskotas
and Stavros Koskotas, Defendants.

No. 88 Civ. 8412 (KMW).

United States District Court,
S.D. New York.

Jan. 31, 1990.

Gerald Walpin, Rosenman & Colin, New York City, for plaintiff.

Stephen L. Braga, Miller, Cassidy, Larroca & Lewin, Washington, D.C., for Camp, Barsh, Bates & Tate.

## MEMORANDUM OPINION

KIMBA M. WOOD, District Judge.

Plaintiff Bank of Crete moves for an order directing that certain funds transferred to defendants' law firm to pay litigation expenses are subject to the preliminary injunction issued by this Court. *See Bank of Crete v. Koskotas,* No. 88 Civ. 8412, 1988 WL 140877 (S.D.N.Y. Dec. 19, 1988) (order granting preliminary injunction). That injunction barred defendants from transferring or withdrawing million of dollars in allegedly stolen assets within defendants' control in the United States and also denied defendants permission to use any of the frozen assets to pay counsel fees and expenses in defense of the underlying action.

Faced with the prospect of planning a defense without the assistance of counsel, defendant George Koskotas, with the help of his brother Stavros Koskotas, in December 1988 appears [1] to have sought the financial assistance of Sarkis Broussalian, a

---

1. It was Stavros Koskotas who in fact called Sarkis Broussalian asking for money on behalf of his brother. Whether George Koskotas asked Stavros Koskotas to make such a request is unclear from the record before the Court.

purportedly wealthy Armenian businessman who had befriended George Koskotas in 1987 while the two were engaged in a transaction involving Koskotas' recently acquired soccer team, Olympiakos. Broussalian agreed to help and was able to assemble, within weeks, $1.4 million to assist in the defense of the Koskotases. These funds were wired in late December 1988 from Broussalian's newly opened Swiss bank account to the Washington, D.C. law firm of Camp Barsh, Bates & Tate ("Camp Barsh"), counsel for the defendants. After plaintiff raised questions concerning the origins of the money, the funds were returned to Broussalian in February 1989, only to be transferred back to Camp Barsh on or about March 28, 1989, where they are currently held in escrow by the firm. It is these funds that are the subject of the motion at hand.

Plaintiff contends that Broussalian's $1.4 million "gift" on behalf of defendants is derived from funds stolen from plaintiff by defendants and thus is subject to this Court's preliminary injunction. It challenges Broussalian's *bona fides* and seeks to cast doubt on whether Broussalian is a man of wealth. In this regard, plaintiff points to Broussalian's continued unwillingness to provide documentation as to the source of his wealth, as well as to his contradictory explanations concerning the method by which he obtained the $1.4 million. Plaintiff also alludes to Broussalian's refusal to turn over deposit slips and account statements relating to the Swiss bank account into which the funds were deposited, as well as to an affidavit from a Bank of Crete official indicating that Broussalian had previously received from Koskotas $157,000 in stolen bank funds. Based on these facts, as well as other contradictions in Broussalian's story, plaintiff asks this Court to declare that the $1.4 million was actually derived from funds stolen from the bank by Koskotas.

Defendants counter that Broussalian is a well-known businessman in the areas of soccer and jewelry who decided to put up the $1.4 million for payment of Koskotas' legal fees out of friendship and concern. According to their account, Broussalian's money is totally unconnected to Koskotas or the Bank of Crete and was put up without any guarantee of repayment. Defendants contend that plaintiff has presented no direct proof linking Broussalian's funds with those allegedly stolen from the Bank of Crete. To conclude that the $1.4 million is derived from stolen Koskotas funds, defendants argue, would be to substitute speculation for proof.

The Court is sympathetic to the obstacles encountered by plaintiff in ferreting out the true source of Broussalian's "gift" funds, but the Court finds, on the evidence presented, that plaintiff has failed to carry its burden of establishing that it will likely prove that these funds are, in fact, stolen Bank of Crete monies transferred by Koskotas to Broussalian. Although it is altogether possible that the "gift" is merely a repayment of stolen Bank of Crete funds that Koskotas gave or lent to Broussalian some time ago, the known facts are equally consistent with the funds having some other source that Broussalian is reluctant to reveal. The Court therefore directs that the money now held in escrow by Camp Barsh may be used to pay for counsel fees and legal expenses incurred on behalf of the defendants.

## I. *The Burden of Proof*

This motion requires the Court to determine whether certain conduct is proscribed by the terms of a preliminary injunction. Federal courts that issue injunctions can and should give declaratory guidance defining the meaning and scope of injunctions issued. *See Regal Knitwear Co. v. National Labor Relations Board,* 324 U.S. 9, 15, 65 S.Ct. 478, 481–82, 89 L.Ed. 661 (1945) (party may petition court granting injunction to construe that order in a "concrete situation" posing a question as to its application); *N.A. Sales Co., Inc. v. Chapman Industries Corp.,* 736 F.2d 854, 858 (2d Cir.1984) (court may issue supplemental clarifying order to "add certainty to an implicated party's efforts to comply" with the terms of the injunction).

Defendants argue that because the issue is whether Koskotas fraudulently conveyed

assets to Broussalian, the appropriate standard of proof should be that for summary judgment in a fraudulent conveyance action—*i.e.*, plaintiff must establish fraud by clear and convincing evidence, and all inferences to be drawn from the underlying facts must be viewed in the light most favorable to defendants, as the party opposing the motion.

Plaintiff, on the other hand, contends that the motion bears little resemblance to a fraudulent conveyance action; it is merely a motion to clarify the obligations of one party under an injunction. Therefore, it claims that its burden of proof should be no more exacting than usual. Plaintiff also contends that because the information needed to establish that the funds belong to Koskotas is not within its control, but is known only to Koskotas and Broussalian, who refuse to divulge the facts, it would be inappropriate to place any burden of proof on plaintiff. Rather, plaintiff contends that the burden should be placed on the defendants to prove that the funds in question are not derived from funds wrongfully appropriated by Koskotas.

■ I cannot accept the contentions of either side. As indicated above, this motion is plainly neither one for summary judgment nor one involving a fraudulent conveyance; the motion simply asks the court to define one party's obligations under a previously issued court order. Therefore, it would be inappropriate for the

Court to import a more exacting evidentiary standard into this context.[2]

On the other hand, there is no basis for shifting the burden of proof[3] away from plaintiff on the facts of this case. It is true that considerations of fairness ordinarily prevent the burden from being placed on a litigant when the facts sought to be established are "peculiarly within the knowledge of his adversary." *See United States v. New York, N.H. & H.R.R. Co.*, 355 U.S. 253, 256 n. 5, 78 S.Ct. 212, 214 n. 5, 2 L.Ed.2d 247 (1957); *Ligi v. Regnery Gateway, Inc.*, 689 F.Supp. 159, 161 n. 5 (E.D.N.Y.1988). However, this case involves the knowledge of a third party— Broussalian—who is neither plaintiff's "adversary" nor a party to this action. His failure to answer certain questions or to provide documentation as to the source of the funds, absent any evidence that Koskotas procured Broussalian's refusal to fully disclose the information, does not make him an "adversary" for purposes of shifting the burden of proof. Similarly, Koskotas' previous invocation of his Fifth Amendment privilege in response to questions regarding the source of funds he was then (in December, 1988) using to pay his attorneys and whether he arranged for any currency or assets to be sent to the United States, does not inexorably lead to the inference that he has any knowledge as to the source of the Broussalian funds.[4]

---

**2.** If defendant's law firm had already spent the funds and this were a contempt motion alleging violation of the Court's previous order, plaintiff would have to prove by "clear and convincing" evidence that defendant and his counsel intentionally violated the Court's order. *See Powell v. Ward*, 643 F.2d 924, 931 (2d Cir.) (per curiam), *cert. denied*, 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981); *New York State Nat'l Org. for Women v. Terry*, 697 F.Supp. 1324, 1331 (S.D.N.Y.1988); *McKay v. Communispond, Inc.*, 581 F.Supp. 801, 810 (S.D.N.Y.1983).

**3.** Even were the Court to agree that the burden ought to be shifted to defendants, such shifting would involve only the burden of production, not the burden of persuasion. The latter burden would remain on plaintiff throughout. *See* Fed.R.Evid. 301.

**4.** Drawing the inference that Koskotas had knowledge regarding the source of the Broussalian funds would require this Court to assume

that Koskotas knew about Broussalian's impending gift at the time Koskotas invoked his Fifth Amendment privilege, on December 22, 1988. Defendants contend that making this assumption (and drawing any adverse inferences as a result) would be improper in light of a subsequent affidavit submitted by Koskotas to this Court wherein Koskotas expressly disavows any connection to the money. Plaintiff argues that this affidavit is meaningless because Koskotas has not been cross-examined with regard to its contents and has refused to turn over documents that would permit plaintiff to test its veracity. Plaintiff also argues that although plaintiff's counsel could not question Koskotas specifically about Broussalian or the $1.4 million at the time of the deposition because counsel was unaware of Broussalian's existence at that time, Koskotas did assert his Fifth Amendment privilege in response to a question asking about the source of funds he used to pay his attorneys. Plaintiff therefore argues that a neg-

However, I am mindful of the difficult position in which plaintiff is placed as a result of Broussalian's unwillingness to turn over certain documents that would resolve doubts as to the source of the funds. Therefore, the Court will apply the "likelihood of success on the merits" standard [5] generally applicable to preliminary injunctive relief.[6] Under this standard, a movant must "make a showing that the probability of his prevailing [on the merits] is better than fifty percent." *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir. 1985); *see also DiLaura v. Power Authority of New York,* 654 F.Supp. 641, 647 (W.D. N.Y.1987) (plaintiff must show that the "probability of success is greater than fifty percent"). In spite of this somewhat reduced evidentiary standard, however, this Court finds that plaintiff has failed to carry its burden of showing that it could or will more likely than not prove that the funds in question constitute the "direct traceable proceeds" of stolen bank funds.

*See In re Fredeman Litigation,* 843 F.2d 821, 827 (5th Cir.), *reh'g denied,* 847 F.2d 840 (5th Cir.1988).

## II. Broussalian and the Source of the $1.4 Million

Plaintiff, conceding that there is no "smoking gun" linking the $1.4 million to either Koskotas or the Bank of Crete, presents circumstantial evidence from which it asks the Court to infer that the funds represent misappropriated Bank of Crete funds allegedly stolen by Koskotas. It claims that Broussalian's portrait of himself as a wealthy benefactor belies the reality and that he could not have managed to procure such funds without Koskotas' helping hand. As evidence of Broussalian's questionable financial capabilities, plaintiff points out that Broussalian has in the past undergone the forced sale of his property on at least two occasions, in the past six years had 20 checks drawn on his bank account returned for insufficient funds,

ative inference can be drawn that Koskotas possesses information regarding Broussalian's funds and that, as a result, the burden of producing evidence should be placed upon defendants.

This Court agrees that Koskotas' affidavit is of little probative value because Koskotas has not been cross-examined with regard to its contents and has refused to turn over documents that would test its veracity. However, even if the Court *were* to assume that Koskotas was aware of Broussalian's offer to pay defendants' counsel fees when Koskotas invoked the privilege, or that Koskotas would now invoke the privilege in response to any questions relating to the funds, that fact would not warrant the drawing of adverse inferences. Any adverse inference that permissibly could be drawn from the invocation of the Fifth Amendment would not substitute for evidence necessary to meet plaintiff's burden of production and thereby shift the burden over to defendants. *See Avirgan v. Hull,* 691 F.Supp. 1357, 1374 (S.D.Fla.1988); *Cf. Vanity Fair Paper Mills, Inc. v. FTC,* 311 F.2d 480, 486 (2d Cir.1962) (no adverse inference can be drawn against party for failure to produce evidence until party with burden of persuasion first presents sufficient evidence so as to shift burden to non-producing party). *See also infra* at pp. 653–54 (discussing the standard for drawing adverse inferences when party invokes Fifth Amendment privilege). As discussed, *infra,* plaintiff has not presented sufficient evidence linking the funds to Koskotas. Absent this sort of independent corroborative evidence, the Court will draw no inference that Koskotas pos-

sesses information with regard to the $1.4 million that would serve to shift the burden of producing evidence to defendants.

**5.** In the Second Circuit, preliminary relief may also be granted where there exists "sufficiently serious questions going to the merits as to make them a fair ground for litigation." *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985). This standard, however, which requires a lesser evidentiary showing, is applied only when the balance of hardships tips "decidedly toward the movant." *Id.* Because barring the use of the funds will force Koskotas to defend the underlying action without the assistance of counsel, this Court cannot conclude that the balance of hardships in this case tips decidedly toward either side.

**6.** I agree with plaintiff's contention that it should not be put to the burden that would be appropriate were this a trial on the merits. This motion, as a practical matter, seeks the same relief as would a motion for a preliminary injunction directed to the transferred funds. Were there no preliminary injunction in place, plaintiff would now be seeking to preliminarily enjoin the use of these funds; the fact that because a preliminary injunction *is* in place, plaintiff is instead seeking a declaration that the existing preliminary injunction applies to these funds does not alter the result that plaintiff seeks. Thus, it appears to the Court to be both logical and sensible to apply the standard appropriate in the preliminary relief context.

had to borrow money and liquidate assets in order to come up with the $1.4 million needed here and refuses to document his wealth or his claims to certain assets.

Plaintiff further argues that inconsistencies run throughout Broussalian's story regarding how he was able to put together the $1.4 million. For instance, in the "English Package," [7] Broussalian stated that the money was derived from $900,000 on hand and $500,000 in business debt repayment and that the funds were deposited into his Swiss bank in cash and "bank cheques." In a subsequent discussion with an associate of the Camp Barsh firm, Broussalian stated that the funds consisted of $100,000 on hand, $780,000 borrowed from five individuals, $80,000 in business debt repayment and $570,000 from the sale of jewelry. In a later, third interview, in Argentina, Broussalian changed his story yet again, stating that money deposited into his Swiss account consisted of $1 million on hand, $500,000 in assets he sold and $450,000 in borrowed money. These funds, he claimed, were deposited entirely in cash, not in bank cheques.

Plaintiff also points to suspicious circumstances surrounding the deposit of the funds into the Swiss account. First, Broussalian refused to hand over to plaintiff's counsel deposit slips or documents reflecting account activity [8] for the period in question, about December 1988. From this refusal, plaintiff requests that this Court draw the inference that the information would be unfavorable. Second, Broussalian had been a customer with another bank, the Trade Development Bank in Lugano ("Trade Bank") for 12 years. At about the same time that Stavros Koskotas called Broussalian asking for money for George Koskotas' defense, his contact at the Trade Bank moved over to the Republic National Bank–Lugano ("Republic Bank"), an American bank. Broussalian claims he opened an account at the Republic Bank and deposited the funds into it simply because his contact switched banks. He also refuses to reveal the name of this "contact" who moved over from the Trade Bank to the Republic Bank. From these facts, plaintiff argues that the only reasonable inference to be drawn is that Broussalian opened a new account in order to make it more difficult to trace the tainted, Koskotas origins of the funds.

Finally, plaintiff relies on an affidavit by a Bank of Crete auditor that Broussalian on August 1, 1988 opened two accounts at the Bank of Crete, into one of which was deposited $157,000, which funds plaintiff claims were stolen from plaintiff by Koskotas.[9] Because Broussalian quickly transferred these funds, plaintiff contends that the opening of this account seems suspicious, particularly in light of Broussalian's original statement that he never had an account with the Bank of Crete.

■ In spite of the various inconsistent statements and suspicious circumstances surrounding the procurement of the funds in question, I cannot conclude that plaintiff could eventually prove that it is more likely than not that the Broussalian funds were misappropriated from plaintiff, or even that they belong to Koskotas. The issue for resolution here is not to establish how Broussalian earned every penny of the $1.4 million or whether Broussalian's story is perfectly consistent. The focus of the Court's attention is whether the evidence, either direct or circumstantial, points to a link between the $1.4 million and funds misappropriated from plaintiff. With this important consideration in mind, I address plaintiff's proffered evidence.

---

7. The "English Package" consists of notes made by two English solicitors summarizing statements made by Broussalian at a meeting with defendants' counsel in London on January 19, 1989, as well as the opinion of two English barristers setting forth their tentative conclusion, based on these notes, that the transferred funds were unrelated to Koskotas.

8. Although Broussalian did turn over a Swiss bank statement indicating a withdrawal of $1.4 million, the statement does not reflect any previous account activity, such as when and in what quantities any deposits were made.

9. According to the Stefanides Affidavit, the first account was actually a joint Koskotas–Broussalian account. (Stefanides Aff. p. 2)

First, the fact that Broussalian may have had financial difficulties at one point in the past hardly justifies the inference that Broussalian's only source for the funds now is Koskotas, or that the funds at issue are stolen Bank funds. Like many businessmen, Broussalian could simply have gone through hard times, and by 1988 be able to assemble such an amount on short notice. Therefore, the Court considers Broussalian's past financial difficulties to be of little probative value.

Plaintiff's argument concerning Broussalian's various inconsistent statements, particularly with regard to the opening of a second bank account and the source of the funds, is similarly unpersuasive. It would be reasonable for Broussalian to use the foreign office of an American bank to transfer the funds to the United States. Broussalian's failure to give one coherent, consistent accounting of the funds is troubling, but it does not inexorably lead to the conclusion that the source of the funds must have been Koskotas. There are other, equally plausible explanations for the discrepancies, such as the commonly-encountered desire of businessmen to maintain the privacy of their business associations and transactions (particularly businessmen who are not used to the wide sweep of discovery in our federal courts). However, even if the Court were to be persuaded that Broussalian was intentionally misleading his questioners by making up whatever came into his head, that would still not, standing alone, lead to an inference that the money was given to him by Koskotas.

Plaintiff argues that Koskotas' invocation of the Fifth Amendment privilege against self-incrimination,[10] and Broussalian's refusal to answer certain questions and to provide bank account statements and deposit slips, warrant an inference that the information, if provided, would prove unfavorable. The Supreme Court has held that an adverse inference may be drawn

against parties in civil actions who invoke the privilege against self-incrimination in the face of "probative evidence offered against them." *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976). The drawing of such an inference is permissible, however, only where it is "only one of a number of factors to be considered by the finder of fact in assessing a penalty." *Lefkowitz v. Cunningham,* 431 U.S. 801, 808 n. 5, 97 S.Ct. 2132, 2137 n. 5, 53 L.Ed.2d 1 (1977). A plaintiff thus cannot rely solely on a defendant's assertion of the privilege in order to sustain plaintiff's own burden of coming forward with sufficiently probative evidence; "there must be sufficient independent evidence—besides the mere invocation of the privilege—upon which to base the negative inference." *United States v. Local 560,* 780 F.2d 267, 292–93 n. 32 (3d Cir.1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986); *see also Pagel, Inc. v. SEC,* 803 F.2d 942, 947 (8th Cir.1986) (lower court permissibly drew adverse inference because "inference served only to support already established findings"); *United States v. Bonanno Organized Crime Family,* 683 F.Supp. 1411, 1452 (E.D.N.Y.1988) (adverse inference drawn "may not be the sole basis for imposing liability on a defendant" and court will require "independent corroborative evidence of the matters to be inferred from a defendant's invocation" of the privilege) *aff'd* 879 F.2d 20 (2d Cir.1989); *SEC v. Musella,* 578 F.Supp. 425, 429–31 (S.D.N.Y. 1984) (defendant's refusal to testify "is *a* factor that may be considered by the court") (emphasis supplied).

The Court cannot conclude that there exists "sufficient independence evidence" upon which to base the inference that the funds in question are funds stolen from the Bank of Crete by Koskotas. Plaintiff simply has not presented sufficient evidence to permit the inference that there exists a

---

**10.** Although George and Kathy Koskotas have presented to this Court signed affidavits swearing that there is no connection between their own assets and the funds transferred to Camp Barsh by Broussalian, the Court, as noted previously, finds them to be of no probative value in light of Koskotas' refusal to turn over documents that could be of assistance in testing the statements made.

direct link between Koskotas and the $1.4 million.

■ Nor can any unfavorable inference be drawn from Broussalian's refusal to turn over documents. The general evidentiary rule is that a party's failure to provide relevant evidence within its control supports an inference that the evidence would be harmful to the party's cause. *United States v. Philatelic Leasing, Ltd.,* 601 F.Supp. 1554, 1565–66 (S.D.N.Y.1985), *aff'd* 794 F.2d 781 (2d Cir.1986); *Consolidated Rail Corp. v. Nevins–Petrillo Warehouse & Distribution Systems, Inc.,* 619 F.Supp. 900, 906 (S.D.N.Y.1983). There are two exceptions to this rule. First, no unfavorable inference may be drawn where the party has good reason to believe that its opponent has failed to meet its burden of proof. *National Labor Relations Board v. Chester Valley, Inc.,* 652 F.2d 263, 271 (2d Cir.1981); *Vanity Fair Paper Mills,* 311 F.2d at 486 (2d Cir.1962) (noting that "the inference from the non-production of evidence cannot be availed of by a party having the burden of persuasion 'until the burden of producing evidence has shifted'") (quoting *Wigmore on Evidence* (3d Ed.1940)). Second, the inference may be rebutted by an adequate explanation for non-production. *Consolidated Rail Corp.,* 619 F.Supp. at 906. Of course, the evidence sought must be within the control of a party to the action.

Defendants argue that no presumption should be drawn against them for Broussalian's failure to answer all questions and to turn over important bank documents for inspection. The general rule applies only to parties to the action or information within their control. Defendants contend that Broussalian (as an independent third party) and information he possesses fit neither criterion. Plaintiff, on the other hand, argues that Broussalian, as a concerned benefactor, should be considered a real party in interest for purposes of the rule. Alternatively, plaintiff urges that because Stavros Koskotas was able to persuade Broussalian to donate the funds, Broussalian (and presumably the documents) are effectively under the control of defendants, thereby warranting that adverse inferences be drawn.

I cannot agree with plaintiff's arguments. Broussalian is simply not a "party" to this action. He has disclaimed all interest in the funds. The mere fact that he might like to see defendants prevail on this motion does not render him a real party in interest. Moreover, although Broussalian made a very large payment to defendants' counsel on the strength of a few phone calls, it does not necessarily follow that either Broussalian or the bank documents are within defendants' control. Broussalian may have good reasons for not wanting to reveal his business associations or his personal bank statements. The fact that he was willing to help a friend is not inconsistent with his refusal to answer questions or provide documents. Perhaps his willingness to help his friend went only so far, and did not extend to public disclosure of his business transactions.

Furthermore, even if Broussalian could be deemed to be either a real party in interest or under the control of defendants, the exceptions to the rule would apply. First, plaintiff has presented insufficient evidence from which this Court could infer that the funds were transferred to Broussalian by Koskotas. Therefore, defendants had good reason to believe that plaintiff had failed to meet its burden. In such a situation, no adverse inference can be properly drawn from non-production. *See Chester Valley,* 652 F.2d at 271; *Vanity Fair Paper Mills,* 311 F.2d at 486. Second, Broussalian has offered a satisfactory explanation for his desire to keep certain information to himself—his privacy concerns, *see Consolidated Rail Corp.,* 619 F.Supp. at 906—and thus no adverse inference may be drawn from his failure to produce information. The Court will thus draw no adverse inference against defendants on account of Koskotas' invocation of his Fifth Amendment privilege and Broussalian's refusal to answer questions or to provide documentation.

Plaintiff seeks to connect Broussalian to the stolen funds by presenting an affidavit stating that Broussalian previously opened

two accounts at the Bank of Crete on August 1, 1988 and that $157,000 in stolen bank funds was deposited by Koskotas into one of them. Because most of the funds were quickly transferred out of that account, plaintiff contends that Broussalian must have been a knowing and willing conduit for Koskotas' scheme to defraud the bank. Therefore, it contends that it would be reasonable to assume that Broussalian's later opening of a new Swiss account accomplished the same illicit goal. Broussalian, after denying in January 1989 that he ever had an account with the Bank of Crete, stated in April 1989 that the money was deposited in his account at the Bank of Crete as a commission for the sale of a soccer player to Koskotas' team, Olympiakos.[11] The reason the money was transferred out so quickly, he claims, was to pay debts owed.

Even if Broussalian opened a Greek bank account and received stolen money from Koskotas, there is no evidence that he knew the money was stolen, no evidence that the funds were received for a purpose other than a legitimate business transaction, and no evidence that the funds deposited later into the Swiss bank account belonged to Koskotas or the Bank of Crete. The evidence tying these two events together is simply too tenuous for this Court to infer that the $1.4 million represent funds that were stolen from the Bank by Koskotas.

Plaintiff also suggests two possible scenarios by which Koskotas could have transferred the $1.4 million to Broussalian. Because these suggestions, though plausible, are entirely speculative and unsupported by any of the evidence, the Court will address them no further.

### III. *Conclusion*

Although the Court is mindful of the roadblocks plaintiff has faced in trying to learn the source of the "gift" funds, and believes that plaintiff has presented a plau-

sible scenario for their being Bank of Crete funds, it remains no more than a plausible scenario. There is not sufficient evidence from which the Court could reasonably conclude that the funds in question are more likely than not funds stolen from the Bank of Crete by Koskotas. It is equally plausible that Broussalian raised the money elsewhere for his good friend's defense, and is unwilling to air his business dealings in public in this suit. Plaintiff has thus not met its burden of showing that it could or will more likely than not prove that the "gift" is traceable to stolen Bank of Crete funds.

I hereby direct that the funds presently held in escrow by Camp Barsh may be used to pay for counsel fees and legal expenses incurred on behalf of defendants.

SO ORDERED.

---

11. It was reported in the Greek press that the sale of this player to Olympiakos, though attempted, never actually occurred (Def.Reply Mem.Ex. B). However, this fact does not mate-

rially affect this Court's determination that insufficient evidence has been presented tracing the $1.4 million to Koskotas.