**Anthony Philip ROMEO,
Petitioner, Appellant,**

v.

**James B. ROACHE,
Respondent, Appellee.**

No. 87–1472.

United States Court of Appeals,
First Circuit.

Submitted May 29, 1987.
Decided June 11, 1987.

Elliot D. Lobel and Peckham, Lobel, Casey & Tye, Boston, Mass., on petition for writ of habeas corpus.

Before COFFIN, BOWNES and BREYER, Circuit Judges.

PER CURIAM.

This is an appeal from the denial of a petition for writ of habeas corpus which had sought review of a magistrate's certificate of extraditability and order of committment certifying petitioner's extradition to Canada. The district court determined there was a sufficient basis for extradition, denied the habeas petition, and refused a stay of extradition pending appeal. By order entered May 29, 1987, this court granted a temporary stay of extradition. We now, after a review of the contentions made below, dissolve the stay and summarily affirm the order dismissing the habeas petition.

We recount the background.

An affidavit in support of extradition was executed by Officer Edmonds of the Royal Canadian Mounted Police (RCMP). He stated he had been assigned to investigate the murder of Constable Aucoin. He related the following: On March 8, 1987, Constable Cannon found Constable Aucoin slumped over in the front seat of a police car with a bullet wound in his head. Aucoin had originally been discovered by a passing motorist at 10:55 Atlantic Standard Time, March 8, 1987. The police car with Aucoin was on Highway 640 at or near Yoho Lake, York County, New Brunswick, approximately nine miles south of the city of Fredericton. A pen was in Aucoin's hand and a partially completed traffic ticket was beneath his body. A copy of the traffic ticket, attached to the affidavit, indicated the ticket was issued on March 8, 1987 to Anthony Romeo, date of birth March 8, 1963, address Skunks Misery Road, Locust Valley, New York. The ticket described the car being driven as a "PORS" with New York license plate number 5578 BGP. The owner of the vehicle, according to the ticket, was Cross Town Leasing of Jamaica, New York. Petitioner's name is Anthony Romeo and his parents, if not he, live on Skunks Misery Road in Locust Valley, New York. Affiant Edmonds continued that he had been informed by Immigration Inspector Sylvia Cutliffe of United States Customs at Calais, Maine that at 11:30 Atlantic Standard time on March 8 she registered a gold Porsche with New York license plate number 5578 driven by a male whom she had identified from news photos as petitioner.

Affiant Edmonds was also informed by a service station attendant in Calais, Maine that at approximately 11:30 Atlantic Standard Time a person he believed to be petitioner purchased gas, telling the attendant to hurry, and leaving after receiving $13.60 worth of gas but giving $20 to the attendant.

Further information conveyed to affiant Edmonds by Detective Polombo of the Massachusetts State Police indicated that petitioner had been arrested on the Canadian

murder charge at 16:47 Atlantic Standard Time at Logan Airport. He had first identified himself by showing an airline ticket in the name of Philip Qotino and then produced a temporary New York driver's license in the name of Anthony Romeo. A New York driver's license and a New York motor vehicle registration for a 1984 Porsche showing the owner to be Cross Town Leasing of Jamaica, New York were found concealed in petitioner's cowboy boot.

Affiant Edmonds also stated that he had been informed by Constable Saunders that Saunders had found a canvas bag approximately .7 kilometers from the shooting scene. The bag contained one rifle stock, one rifle case, one "PROLINE ZX" crossbow, and two boxes of .38–40 calibre ammunition. A salesman at the sporting goods store in New York who knew petitioner stated he had sold a "PROLINE ZX" crossbow to petitioner in February 1987. The rifle stock fit a .38–40 Winchester rifle found, without stock, approximately 15 meters from the shooting of Constable Aucoin. A member of the firearms section of the RCMP Forensic Laboratory determined that the Winchester rifle found at the scene had discharged the bullets which had killed Constable Aucoin. Further circumstantial information linking petitioner with the shooting was recounted, which we need not now detail.

Petitioner moved to dismiss the extradition proceedings on the grounds that his Fourth, Fifth, and Sixth Amendment rights had been violated. In particular, he charged the following. First, in defiance of instructions from his attorneys that he not be interviewed without their presence, petitioner was interviewed on March 10, 1987 at the Salem House of Correction. Corporal Spink of the RCMP was in an adjoining room. Petitioner allegedly admitted having been stopped outside of Fredericton, New Brunswick for speeding on March 8, 1987. This admission was incorporated into the last paragraph of Officer Edmond's affidavit in support of extradition. Petitioner contended that he had not been given Miranda warnings and that, due to mental incompetency, he was incapable of knowingly consenting to the interview. Second, under the pretext of searching for evidence in a separate year-and-a-half-old murder charge to which petitioner was somehow linked, a search warrant for his parents' home at Skunks Misery Road had been obtained and a search, far in excess of the scope authorized by the warrant, had been conducted. Allegedly uncovered and seized was a handwritten bill of sale for a weapon matching the murder weapon. This information concerning the bill of sale was contained in a second affidavit in support of extradition submitted by Officer Wadden of the RCMP. Petitioner's attorney stated that petitioner's parents would testify there was no such bill of sale.

The magistrate noted that there was no question but that in a prosecution under state or federal law, petitioner's allegations would form the basis for a motion to suppress or, possibly, a motion to dismiss the charges. He concluded, however, that the allegations, even if true, would not support a dismissal of the extradition proceedings and hence petitioner was not entitled to an evidentiary hearing to litigate the Fourth, Fifth, and Sixth amendment issues.

Petitioner sought to introduce an April 5, 1987 report from Dr. Cannon stating that on the basis of six interviews totaling 13 hours she had concluded claimant was suffering "chronic, psychotic illness of a paranoid nature which at present renders him unable to consult with his attorneys with a reasonable degree of rational understanding and which renders him unable to achieve a rational understanding of the proceedings against him." The magistrate excluded the report relying on *Charlton v. Kelley*, 229 U.S. 447, 33 S.Ct. 945, 57 L.Ed. 1274 (1913), which had upheld a similar exclusion. The magistrate issued a certificate of extraditability and petitioner then sought review in the district court via a habeas petition.

The district court correctly noted the narrow scope of review on a habeas corpus proceeding challenging extradition. Habeas corpus is available "only to inquire [1] whether the magistrate had jurisdiction, [2] whether the offense charged is within the

treaty and, by a somewhat liberal extension, [3] whether there was reasonable ground to believe the accused guilty." *Sabatier v. Dabrowski*, 586 F.2d 866, 868 (1st Cir.1978) (quoting *Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925)); *Brauch v. Raiche*, 618 F.2d 843, 847, 854 (1st Cir.1980) (same).

Before the district court, petitioner did not contend either that the magistrate lacked jurisdiction or that the murder offense was not within the treaty. He did, however, challenge the third, probable cause, requirement arguing that insufficient competent evidence was introduced at the extradition hearing to establish probable cause that petitioner committed the murder. He also presented two other arguments. First, because of his incompetency, he could not knowledgably participate in the extradition proceedings. To extradite one who has had no meaningful input or understanding of the extradition proceedings against him would be a denial of due process. Second, state and Canadian authorities had colluded to violate his Fourth (pretextual search of home), Fifth (no Miranda warnings), and Sixth (interview without counsel's permission) amendment rights, and now the Canadian authorities had the fruits of those violations. The only meaningful sanction to deter such improper conduct would be denial of extradition. We address each argument, though in a somewhat different order.

1. *Due Process.*

█ Petitioner points out that at an extradition hearing, the accused has the right to present evidence which may explain ambiguities or doubtful elements in the case against him (but he cannot present defenses), *Collins v. Loisel*, 259 U.S. 309, 315–317, 42 S.Ct. 469, 471–472, 66 L.Ed. 956 (1922), and he argues that elemental due process is violated when a person lacking the capacity to understand the proceedings against him or to participate effectively in them is certified as extraditable. Consequently, petitioner contends, the magistrate should have held a hearing to assess his competency.

In *Charlton v. Kelly*, 229 U.S. 447, 33 S.Ct. 945, 57 L.Ed. 1274 (1913), the Supreme Court noted that "impressive evidence of the insanity of the accused" had been excluded at an extradition proceeding. The Court concluded habeas relief was not warranted, however, stating, "If the evidence was only for the purpose of showing present insanity by reason of which the accused was not capable of defending the charge of crime, it is an objection which should be taken before or at the time of his trial for the crime, and heard by the court having jurisdiction of the crime." *Id.* 462, 33 S.Ct. at 950.

Petitioner argues that the due process and Sixth amendment right to counsel argument he is raising now was never specifically addressed in *Charlton* and hence *Charlton* is not controlling. Further, he relies on *Matter of Extradition of Artukovic*, 628 F.Supp. 1370, 1375 (C.D.Cal.1986), where a district court specifically rejected the government's contention that the accused's competence was not a proper subject of inquiry in an extradition proceeding. Instead, the district court ruled,

"The Sixth Amendment guarantees him, as all persons before the court in matters affecting life and liberty, the effective assistance of counsel. Meaningful consultation between attorney and client is an essential element of competent representation [citation omitted]. Furthermore, respondent's Fifth Amendment right to a fair hearing requires that he be shown to have ... minimum competence. *Pate v. Robinson*, 383 U.S. 375, 385, 86 S.Ct. 836, 842, 15 L.Ed.2d 815 (1966)."

*Id.* at 1375. Based on reports and testing from an attending government physician and from the court's appointed psychiatrist, the accused was found competent.

The court in *Artukovic* did not mention *Charlton v. Kelly*, and it relied solely on criminal cases which guaranty defendants a right to counsel in *criminal* cases and proscribe the *criminal conviction* of legally incompetent defendants as violative of due process. Extradition proceedings, however, are generally not considered

*criminal* prosecutions. *Sabatier v. Dabrowski*, 586 F.2d 866, 869 (1st Cir.1978).

It is true, as petitioner contends, that the Supreme Court in *Charlton v. Kelly* did not expressly address the due process argument petitioner raises. Petitioner is wrong, however, to read *Charlton* as holding nothing more than that a statute discussed in *Charlton*, Act of August 3, 1882, 22 Statutes 215, c. 378, § 3, had conferred no right to present evidence of insanity. Rather, the tenor of *Charlton* was that in view of the limited function of extradition proceedings—extradition proceedings were not to be regarded as a final trial at which guilt or innocence would be determined but rather as but a preliminary examination to determine whether a sufficient case had been made to justify holding the accused to answer the charge against him—and the limited scope of review of extradition matters in habeas corpus proceedings, competency was a matter to be determined by the jurisdiction trying the offense and not by the extraditing jurisdiction.

We further note that we are not presented here with a claim that petitioner is catatonic, has lost all contact with reality, or is totally unable to communicate, and we do not decide how we would view a due process argument were a severe claim of that sort presented. Rather, the doctor's report that petitioner submitted indicated that, although petitioner had a history of past drug abuse and exhibited paranoid ideas (he thought his cell mates were spies, his food was drugged, etc.), petitioner was oriented to time, person, and place and his recent and remote memory were intact. The doctor purported to assess competency with respect to whether petitioner was fit to stand trial on *criminal charges*, that is whether he had "sufficient present ability to consult with his attorney with a reasonable degree of rational understanding" and whether he had "a rational as well as factual understanding of the proceedings against him." The doctor noted that while petitioner had been "able to describe the charges against him and to discuss the potential consequences if convicted, he was totally unable to grasp the reality of the evidence against him or to discuss the pos-

sible legal defenses available to him." Rather, petitioner had angrily insisted that the described evidence could not exist and had accused his attorney of making the evidence up or of working with the prosecutions. Petitioner "tried to discuss the case and evidence," but was "unable to cooperate ... even in discussing coherently the events of the day of the alleged offense. Instead he insisted that he would simply take the stand and deny the charges. He was unable to disclose significant details because of his guardedness. He was able to state the lawyer-client privilege but was unable to accept it.... [H]e manifested overtly self-defeated behavior in refusing to cooperate with his attorneys or listen[ ] to their advice and counsel...." Based on the foregoing, the doctor concluded petitioner would be unable to testify relevantly, would not be able to challenge witnesses effectively, and, in general, suffered "a chronic, psychotic illness of a paranoid nature which at present renders him unable to consult with his attorneys with a reasonable degree of rational understanding and which renders him unable to achieve a rational understanding of the proceedings against him."

Given the limited purpose of extradition proceedings and the tenor of the *Charlton* case, we conclude due process does not require a competency hearing in extradition proceedings, at least absent a more severe condition than the one described in the doctor's report.

2. *Dismissal of Extradition Proceedings as a Remedy for Violation of Constitutional Rights.*

■ Since no evidentiary hearing was held, we must assume for the purpose of this decision that the interview at the Salem House of Correction and the search of the Skunks Misery Road home have violated petitioner's constitutional rights. Nevertheless, essentially for the reasons stated in the magistrate's opinion, we find that petitioner's cases are unconvincing and that relief is not warranted in this habeas proceeding. As the magistrate pointed out, it was state—not federal—offi-

cials who conducted the interview and search. Dismissal of extradition proceedings would not seem to serve much of a deterrent effect to such state conduct. If petitioner's rights were violated, he may seek redress in a § 1983 damages action. More egregious governmental conduct than that alleged here would be required before a court should interfere in international affairs by denying foreign states their rights under extradition treaties. *See also Simmons v. Braun,* 627 F.2d 635 (2d Cir. 1980) (exclusionary rule would not be applied in extradition proceedings to suppress defendant's identification as the fruit of an illegal stop and search).

### 3. *Probable Cause.*

The parties appear to agree that under the relevant Canada-United States Extradition Treaty, "extradition shall be granted only if the evidence be found sufficient, *according to the laws of the place where the person sought shall be found* to justify his committal for trial," (emphasis added) in other words, according to the laws of Massachusetts since that was where petitioner was arrested. Petitioner then points out that under Massachusetts law, a defendant at a probable cause hearing has the right to cross-examine the prosecution's witnesses and to present an affirmative defense; only evidence which would be admissible at trial may be presented; and in determining whether sufficient evidence has been produced, the magistrate must apply a "directed verdict" standard, that is whether, if the hearing were a trial, there would be enough evidence to send the case to the jury. *Myers v. Commonwealth,* 363 Mass. 843, 298 N.E.2d 819, 823–824 & n. 6 (1973). Petitioner contends this standard of probable cause was not met because apparently the evidence presented was by affidavit and hence petitioner could not cross-examine the affiants and the government presented no evidence on sanity, evidence petitioner contends would be needed under the Massachusetts directed verdict standard.

■ In rejecting petitioner's contention that the government was required to pro-

duce evidence of sanity, the district court pointed out that under Massachusetts law, sanity is not an element of a crime, but rather is a defense, and the prosecution need not prove sanity beyond a reasonable doubt before the issue is raised. *Commonwealth v. Kostka,* 370 Mass. 516, 532–547, 350 N.E.2d 444, 455–458 (1976). Further, the court ruled that while petitioner had challenged his competency to stand for extradition, he had not contended he was insane at the time of the shooting, and hence under Massachusetts law no evidence of sanity was required. We agree. While there may be overtones to Dr. Cannon's report that petitioner's psychotic illness has persisted for some time, the doctor addressed only competency to stand trial on criminal proceedings and did not render an opinion or whether or not petitioner was competent at the time of the shooting. Thus, we need not decide whether we would reach any different result had petitioner proffered evidence that he was incompetent at the time of the shooting. *But see Charlton v. Kelly,* 229 U.S. 447, 462, 33 S.Ct. 945, 950, 57 L.Ed. 1274 (1913) (indicating in an extradition proceeding that where insanity is a defense under the law of the extraditing state, evidence of insanity at the time of the commission of the offense is a matter for the jurisdiction seeking extradition, not the extraditing court).

■ As for the challenge to hearsay evidence, we reject it for the reasons stated by Judge Friendly in *Shapiro v. Ferrandina,* 478 F.2d 894, 901–902 (2d Cir.), *cert. dismissed,* 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973). The magistrate, therefore, properly considered the evidence contained in the affidavits. As the district court has noted, this evidence—including the partially completed traffic ticket containing petitioner's name and a description of his car, the subsequent identifications of petitioner by the customs agent and service station attendant near the border, and the discovery of a bag of weapons containing a crossbow recently purchased by the petitioner and the stock of the rifle found by the forensic laboratory to be the murder weapon—is sufficient to sustain a finding

of probable cause under Massachusetts law. Consequently, we find no error in the approach taken by the district court.

The order denying the petition for writ of habeas corpus is affirmed and the stay of extradition is dissolved.