George KOSKOTAS, Petitioner,

v.

James B. ROCHE, United States Marshal for the District of Massachusetts, Respondent.

Civ. A. No. 89–2193–WD.

United States District Court, D. Massachusetts.

June 27, 1990.

Ronald S. Liebman, Patton, Boggs & Blow, Washington, D.C., for petitioner.

Victor A. Wild, Asst. U.S. Atty., for respondent.

## MEMORANDUM

WOODLOCK, District Judge.

Petitioner George Koskotas seeks a writ of habeas corpus as relief from Magistrate Alexander's *Certification of Extraditability and Order on Extradition,* which would return him to the Hellenic Republic of Greece for criminal prosecution. Koskotas argues, *inter alia,* that Greece has not adequately supported the offenses charged, that Greece seeks to prosecute him for political offenses, that he will be subject to terrorist attack should he be returned, and

that procedural irregularities have denied him due process. After careful review, I find that except in one relatively minor respect the Magistrate's certification may stand.

## I

### Procedural and Factual Background

In 1988, scandal disrupted Greek politics, ultimately leading to the ouster of Prime Minister Papandreou and his party (PA-SOK) from control of the Greek government.[1] One aspect of the scandal involved allegations of a scheme of PASOK government favoritism bestowed upon the Bank of Crete ("Bank") in exchange for embezzled Bank funds pocketed by political officials. This aspect of the scandal came to be known as "the Koskotas Affair," named for the petitioner George Koskotas, who was the chairman, managing director, and majority owner of the Bank.[2]

Greece, which has had an extradition treaty with the United States for over 50 years ("the Treaty"), seeks the extradition of Koskotas in order to prosecute him pursuant to four warrants. Those warrants variously charge that:

(1) Koskotas misappropriated more than $17 million from Bank of Crete funds on deposit at Irving Trust in the United States, and forged letters from Irving Trust to conceal the crime (the "Irving Trust Misappropriation");

(2) Koskotas misappropriated more than $13 million from Bank funds on deposit at Merrill Lynch in the United States, and forged letters from Merrill Lynch to conceal the crime (the "Merrill Lynch Misappropriation");

(3) Koskotas embezzled funds by causing the Bank to transfer approximately $200 million to accounts owned by him or companies he controlled (the "Bank of Crete Embezzlement");

(4) Koskotas altered and used a Merrill Lynch account statement to falsify evidence that transfers had been made by the Bank to five persons, including high-ranking government officials (the "Merrill Lynch Forgery"); and

(5) Koskotas fraudulently obtained certified Greek travel documents by falsely informing Greek Embassy officials in Washington, D.C. that he had lost his passport (the "Travel Documents Fraud").

Koskotas, under constant surveillance by the police and aware that he was about to be charged, fled Greece in November of 1988, before the warrants issued. Koskotas and his family first travelled to Brazil, which has no extradition treaty with Greece. However, allegedly fearing that he would be assassinated there by Greek secret police, Koskotas and family came to the United States for safety.

On November 24, 1988, Koskotas was arrested by agents from the FBI and the United States Customs Service after landing in New Bedford, Massachusetts. On behalf of the Greek government, the United States Attorney for the District of Massachusetts filed a complaint for a provisional arrest warrant. Magistrate Alexander issued the warrant and Koskotas was taken into federal custody. He has been held in the Essex County Jail (Salem) since that time.

The formal Request for Extradition and Government's Submission of Evidence were timely filed on January 20, 1989, and were supplemented on March 20, 1989. On June 16, 1989, Magistrate Alexander conducted a hearing on Koskotas' motions to dismiss or stay the extradition proceedings, to obtain

---

1. In July, 1989, the PASOK-controlled government was replaced by an alliance government of the conservative New Democracy party and the communist parties. These odd bed-fellows joined expressly to investigate and address the scandals involving the PASOK government. Elections in November, 1989, installed another interim government. Most recently, elections in April, 1990, installed a New Democracy party government with a bare parliamentary majority.

2. As a measure of the affair's notoriety, the international edition of *Time* magazine featured a lengthy interview with Koskotas in which he detailed the scheme (and assigned blame for its architecture upon the PASOK government). The interview took place in the Massachusetts jail where Koskotas has been held pending a determination regarding his extraditability. Former Prime Minister Papandreou has filed a defamation action against *Time* in Switzerland.

bail, and to obtain discovery; she denied those motions by Order dated July 13, 1989. *Matter of Extradition of Koskotas,* 127 F.R.D. 13 (D.Mass.1989). The Magistrate considered extradition on the merits at a hearing on July 25, 1989, and on August 24, 1989, she issued the "Certification of Extraditability and Order on Extradition—August 24, 1988 (sic)" finding sufficient evidence to warrant extradition on all charges pursuant to the Treaty.[3]

## II

### *Alleged Special Circumstances*

In addition to his legal grounds for opposing extradition, Koskotas points to three factual circumstances which he argues justify special treatment: (A) a pending criminal matter in the United States; (B) a pending civil matter in the United States; and (C) the terrorist threat to his life should he be returned to Greece.

### –A–

Koskotas was indicted in 1980 in the United States District Court for the Southern District of New York along with his brother, sister-in-law, and a fourth conspirator on charges that they had devised and executed a scheme to defraud the IRS and the New York Department of Labor in 1978–79. Koskotas was not arrested until October, 1987, and the case was dismissed on June 23, 1988, on the grounds that Koskotas had been denied a speedy trial. *United States v. Koskotas et al.,* 695 F.Supp. 96 (S.D.N.Y.1988). On appeal, the Second Circuit vacated the dismissal and remanded the case for further hearings. *United States v. Koskotas,* 888 F.2d 254, 258 (2nd Cir.1989). A *nolle prosequi* of the criminal action was filed in the Southern District of New York on January 17, 1990, citing "the importance to the foreign policy interests of the United States of completing KOSKOTAS's extradition without undue delay." Thus, the previously pending criminal case is no longer a factor in this proceeding.

### –B–

Although the United States criminal case against him has now been dropped, Koskotas remains a defendant in a civil suit in the Southern District of New York, *Bank of Crete, S.A. v. Koskotas et al.* (No. 88 Civ. 8412). The Bank of Crete commenced the civil suit late in 1988, seeking damages in excess of $100 million as a result of the same conduct underlying the Greek warrants. Although Koskotas technically represents himself *pro se* in that matter because the Court in the Southern District has frozen his assets (including funds set aside for legal fees),[4] three separate firms have filed special appearances on behalf of Koskotas. No evidence has been presented indicating that the case is close to trial.

### –C–

Koskotas contends that if he is returned to Greece, he will be assassinated by terrorists. Extensive newsclippings submitted by Koskotas report that Greece has been plagued by terrorist activity in recent years, and that one of the most lethal and

---

**3.** Generally, extradition proceeds as follows. The proceedings are governed by 18 U.S.C. §§ 3181 *et seq.* The country seeking extradition is required to submit a request through diplomatic channels. The request must be supported by evidence showing that the person sought is the one charged, that the crimes are extraditable offenses under the treaty between the requesting country and the United States, and that probable cause exists as to each offense for which extradition is sought. If the Department of State approves the request, documentation is sent to the United States Attorney in the district where the subject is located. The United States Attorney then seeks a warrant from a federal magistrate.

Under the United States/Greece Treaty, the warrant must be followed by a formal request for extradition and supporting evidence within 60 days. The magistrate conducts a hearing to determine if there is probable cause "sufficient to sustain the charge under the provisions of the proper treaty," 18 U.S.C. § 3184, relying on authenticated documentary evidence and depositions submitted by the foreign government. The magistral hearing is not a full trial—adjudication is a matter for the foreign country. If the magistrate finds probable cause and compliance with the applicable treaty, she certifies the matter to the Secretary of State, who makes the final decision regarding extradition.

**4.** On January 31, 1990, however, the Southern District released $1.4 million for payment of legal fees. *Bank of Crete, S.A. v. Koskotas,* 733 F.Supp. 648, 655 (S.D.N.Y.1990).

active terrorist organizations—17 November—has made the Koskotas Affair one of its stated reasons for violence. For example, on September 26, 1989, terrorists from the 17 November group killed one Pavlos Bakoyannis, calling him "Koskotas' first pillar of support." The Greek police have apparently not been effective against 17 November.

## III

### Standard of Review

 On September 29, 1989, Koskotas filed his petition for habeas corpus on essentially the same grounds he argued in opposition to extradition before the Magistrate. Because an extradition order is not "final" and thus cannot be directly appealed, review is available only by means of a petition for a writ of habeas corpus. *Collins v. Miller*, 252 U.S. 364, 369, 40 S.Ct. 347, 349, 64 L.Ed. 616 (1920). This habeas corpus review of a magistrate's extradition order is narrow in scope—"more limited than direct appeal." *Brauch v. Raiche*, 618 F.2d 843, 847 (1st Cir.1980).

> Whether an extraditable crime has been committed is a question of mixed law and fact, but chiefly of fact, and the judgment of the magistrate rendered in good faith on legal evidence that the accused is guilty of the act charged, and that it constitutes an extraditable crime, cannot be reviewed on the weight of evidence, and is final for the purposes of the preliminary examination unless palpably erroneous in law.

*Ornelas v. Ruiz*, 161 U.S. 502, 509, 16 S.Ct. 689, 691, 40 L.Ed. 787 (1896). "Direct judicial review of extradition proceedings is not available, and habeas corpus review 'is not a means for rehearing what the magistrate already decided.'" *Matter of Extradition of Manzi*, 888 F.2d 204, 205 (1st Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1321, 108 L.Ed.2d 496 (1990) (citations omitted). In reviewing the magistrate's findings, the court

> may only examine "whether the magistrate had jurisdiction to consider the matter, whether the offense charged is within the treaty and by a somewhat liberal

construction, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty."

*Id.*, citing *Romeo v. Roache*, 820 F.2d 540, 542–43 (1st Cir.1987) (quoting *Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925)). Here, because the Magistrate's jurisdiction has not been challenged, review is limited to inquiry (1) whether the offenses charged are included within the Treaty and (2) whether any evidence · supports the Magistrate's probable cause determination. Unless the Magistrate's order was "palpably erroneous" in its application of law, it should be adopted and habeas relief should be denied.

## IV

### Treaty Offenses

"The question whether the offense[s charged] come[ ] within the treaty ordinarily involves a determination of whether [they] are listed as [ ] extraditable crime[s] and whether the conduct is illegal in both countries, *Factor v. Laubenheimer*, 290 U.S. 276 [54 S.Ct. 191, 78 L.Ed. 315] . . . (1933); . . . these are purely legal questions that the habeas court may review *de novo*." *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir.), *cert. denied*, 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986) (citations omitted).

 The Treaty between Greece and the United States lists extraditable offenses at Article II. The United States argues that the offenses charged clearly are on the Article II list, and Koskotas agrees with respect to the misappropriation, embezzlement, and forgery charges. However, Koskotas argues that the charge of obtaining travel documents by fraud is not an extraditable offense.

> Given conflicting interpretations,
> a narrow and restricted construction is to be avoided as not consonant with the principles deemed controlling in the interpretation of international agreements. Considerations which should govern the diplomatic relations between nations, and the good faith of treaties, as well, re-

quire that their obligations should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them. *Factor v. Laubenheimer*, 290 U.S. 276, 293, 54 S.Ct. 191, 195, 78 L.Ed. 315 (1933). Thus, in considering the conflicting interpretations argued by Koskotas and the United States, the language regarding extraditable offenses should be liberally construed.

The travel documents fraud offense in dispute rests on facts related to the American criminal prosecution of Koskotas in the Southern District of New York. *See* Section II.A., *supra*. When Koskotas was arrested in the fall of 1987 on the American indictment, American officials removed his passport. (He was released on $1,000,000 bail). The Government alleges that Koskotas went to the Greek Embassy in Washington, D.C., and "falsely confirmed to the appropriate officer that he had lost the above passport and on the basis of his above false declaration and on account of the fact that the above Greek official was deceived he was given the traveling document ... for his return to Greece, in which the loss of his passport was certified." [5]

The charged Greek crime of Obtaining a False Certificate by Fraud [6] has three essential elements. In order to convict Koskotas on this charge, Greece will have to show that he:

1. By deception;

2. Succeeded in being falsely certified in a public document;

3. As to an incident which may have legal significance.

Magistrate Alexander found that the offense falls within Art. II, ¶ 19 of the Treaty, which allows extradition for crimes involving "obtaining money, valuable securities or other property by false pretenses, or receiving any money, valuable securities or other property knowing the same to have been unlawfully obtained, where the amount of money or the value of property so obtained, or received exceeds two hundred dollars or Greek equivalent."

Koskotas argues that the Treaty requires that an extraditable offense involve property with a minimum value, whereas the offense with which he is charged does not include minimum value as an element. He suggests that as in *In re Wise*, 168 F.Supp. 366 (S.D.Tex.1957), "the only common element between the Treaty offense and the Greek crime is fraudulent intent." [7] Magistrate Alexander rejected this argument on the grounds that "it is plain that falsely obtaining property where the amount or value of property so obtained exceeds two hundred dollars is an incident which may have legal significance." *Koskotas*, 127 F.R.D. at 23.

■ The Magistrate's analysis misconceives the role of the extradition court in evaluating a charge. The question is not whether the travel documents could have a value exceeding two hundred dollars. Rather, the question is whether value is an essential element of the charge. The focus should be on whether the crime charged and the treaty offense share the same essential elements. In other words, the extradition court must inquire whether in order to prove the charged offense the extraditing country is obliged to prove each essential element of the offense covered by the Treaty.

■ The charge of Obtaining a False Certificate by Fraud cannot meet this test. The Greek prosecutor is not required to prove that the value of the passport exceeds $200; any evidence as to value is apparently irrelevant to the Greek offense. Consequently, extradition on this offense

---

5. Government's Answer at 12.

6. Article 220(1) of the Greek Criminal Code.

7. Petition at 83. The analogy to *In re Wise* is inapposite. There, the court found that a vaguely charged act of 'fraud' did not constitute obtaining property by false pretenses (as defined in the United States/Mexico extradition treaty), but made this finding on the grounds that it was unclear what property had been obtained. *Id.* at 369.

would be improper.[8]

■ Apart from the travel documents fraud offense, however, the offenses charged are plainly listed within Article II of the United States/Greece Extradition Treaty. Accordingly, I will allow habeas corpus relief on these grounds only as to the Obtaining by Fraud a False Certificate charge.[9]

## V

### Political Offenses

Most extradition treaties specifically preclude extradition for "political offenses," and the United States/Greece Treaty is no exception. Article III of the Treaty provides that

[t]he provisions of the present Treaty shall not import a claim of extradition for any crime or offense of a political character, nor for acts connected with such crimes or offenses.... The State applied to, or courts of such State, shall decide whether the crime or offense is of a political character.

The clear and longstanding [10] "definition of 'political offenses' ... limits such offenses to acts committed in the course of and incidental to a violent political disturbance such as a war, revolution or rebellion."

*Eain v. Wilkes,* 641 F.2d 504, 518 (7th Cir.), *cert. denied,* 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981).

■ Thus, in order for an offense to be exempted from extradition under Article III of the Treaty, it must meet the two-prong 'incidence' test. The incidence test requires:

(1) the occurrence of an uprising or other violent political disturbance at the time of the charged offense, ... and (2) a charged offense that is 'incidental to' 'in the course of,' or 'in furtherance of' the uprising.

*Quinn v. Robinson,* 783 F.2d at 797 (citations and footnotes omitted) (finding the incidence test "not only workable but desirable" despite some recent scholarly and judicial criticism—*id.* at 801); *see also Garcia-Guillern v. United States,* 450 F.2d 1189, 1192 (5th Cir.1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972). The United States argues persuasively that Koskotas can meet neither requirement because he is charged with financial offenses which took place without connection to any form of violent political uprising.

Koskotas engages in contortionate efforts to bring his case within the political offense exclusion. He intertwines the intense politicization of the Koskotas Affair

---

**8.** Koskotas argues alternatively that he cannot be extradited on this charge because Article V of the Treaty precludes extradition for offenses whose prosecution is time-barred. His argument rests on the fact that the offense allegedly occurred at the Greek Embassy in Washington D.C. (which under Greek case law is not a part of Greece) so that the applicable limitations period—that for extraterritorial jurisdiction—is three months under Article 6 of the Greek Criminal Code rather than the five-year period for which the Government contends. Magistrate Alexander refused to admit the expert testimony of Koskotas' Greek attorney on this point, and rejected the statute of limitations argument, primarily because Koskotas had not supplied the Court with copies of cited cases or statutes. *Koskotas,* 127 F.R.D. at 23–24, n. 8.

The relevant underlying documentation was submitted to me after the hearing in this matter upon my specific direction and it appears that the only identified decision of the Greek Courts to date supports Koskotas' position. The Government does not dispute that this decision supports Koskotas but contends that, as the de-

cision of a misdemeanor court, it is not binding on the Felony Court before which Koskotas will appear.

Upon my review of the submissions of the parties, I find Koskotas' alternative statute of limitations grounds for opposing extradition to be well founded and to establish an independent basis under the Treaty—given the statute of limitations concern of Article V—for denial of extradition as to the travel documents fraud charge.

**9.** Although Koskotas may still be returned to Greece to face prosecution for the other charges, a finding that the travel documents fraud charge is not extraditable means that Greece cannot prosecute him for that offense. "The doctrine of 'specialty' prohibits the requesting nation from prosecuting the extradited individual for any offense other than that for which the surrendering state agreed to extradite." *Quinn v. Robinson,* 783 F.2d at 783 (citations omitted).

**10.** *See Ornelas v. Ruiz,* 161 U.S. 502, 511, 16 S.Ct. 689, 699, 40 L.Ed. 787 (1896).

with the allegation that the PASOK government sought to prosecute him for its own crimes, the downfall of the PASOK government, terrorist threats related to the scandal, and the prevalence of terrorism generally in order to term the Koskotas Affair "merely one aspect of modern political warfare" in Greece. He describes Greece as in a state of "political uprising," being waged in part by "the revolutionary activities of the [terrorist] organizations '17 NOVEMBER,' '1 MAY' and others, designed to undermine the Greek government." He claims that his alleged crimes "—i.e., illicitly funding the PASOK government's battle to stay in power—were incidental to this conflict, resulted from extortionate tactics, and assisted PASOK's and then Prime Minister Papandreou's attempts to perpetuate their control over the Greek government." [11]

For legal support, Koskotas looks to *In re Mylonas*, 187 F.Supp. 716 (N.D.Ala. 1960), apparently the sole published American case interpreting the political offenses clause of the United States/Greece Extradition Treaty. Koskotas stretches the case beyond recognition, suggesting that it provides authority for construing the political offenses clause of this Treaty more broadly. Specifically, he suggests that *Mylonas* allows the court to consider:

(1) The political circumstances that existed while the alleged crimes were being committed and thereafter;

(2) Irregularities in the course of prosecution suggesting political motives;

(3) Undue lapses in prosecution suggesting political motives; and

(4) Inconsistencies in the evidence suggesting political motives.

While the *Mylonas* court did construe the political offense clause rather broadly, *Mylonas* does not support Koskotas' four-point expansion.

In *Mylonas*, after considering arguments regarding severe flaws in Mr. Mylonas's Greek prosecution (e.g., trial without notice), the court reached the political offenses argument only as a secondary holding. The court opined

that the offense for which extradition is sought was incidental to, formed a part, and was the aftermath of political disturbances, and accordingly 'of a political character' of the nature proscribed by the Treaty.

*Id.* at 721. However, the "political disturbance" in question there was the Greek Civil War—the sort of actual violent conflict contemplated by other courts interpreting political offenses clauses.

Here, the only incidents of actual violence occurring in Greece during the general time-period of Koskotas' alleged activities were terrorist attacks by non-governmental organizations. Such activity does not rise to the level of uprising, rebellion, revolution, or war. [12] Even if it did, Koskotas cannot meet the second requirement of the incidence test: the acts complained of "must be causally or ideologically related to the uprising." *Quinn v. Robinson*, 783 F.2d at 809 (citation omitted). The evidence presented by Koskotas, if anything, shows that terrorist activities have been directed against the kind of corruption that the Koskotas Affair represents. Koskotas has failed to show that his alleged misappropriations and embezzlement were ideologically inspired in a manner connected to the terrorist violence.

Because the offenses charged occurred neither in time of violence nor incidental to violent political uprising, I will not disturb the Magistrate's finding that they are not political offenses, and thus are included within the Treaty.

## VI

*Evidence Supporting Probable Cause*

Having considered whether the charged offenses are extraditable pursuant to the

---

11. Petition at 64.

12. Although Greek politics have been tumultuous, the scandal of which the Koskotas Affair is a part appears to have been addressed head on via electoral politics. Greece has continually sought Koskotas' extradition. The original initiative came from the PASOK government, but it has been maintained by the opposing parties which formed the interim governments and the present New Democracy government. In short, partisan changes in government have not affected a change in Koskotas' fugitive status.

Treaty, I must next review whether any evidence supports the Magistrate's probable cause determination. "[T]here must be evidence that would justify committing the accused for trial under the law of the nation from whom extradition is requested.... United States courts have interpreted this provision in similar treaties as requiring a showing by the requesting party that there is probable cause to believe that the accused has committed the charged offense." *Quinn v. Robinson,* 783 F.2d at 783 (citations omitted).

■ However, while the magistrate must conduct a full hearing on probable cause, the only issue on habeas review is " 'whether there is *any evidence* warranting the finding that there was reasonable ground to believe the accused guilty.' *Fernandez v. Phillips,* 268 U.S. at 312 [45 S.Ct. at 542] ... (per Holmes, J.) (emphasis supplied)." *Eain v. Wilkes,* 641 F.2d at 509.

It is generally for the Magistrate to determine if the evidence establishes proba-ble cause to believe that the fugitive committed the crime for which he stands accused. Review of the evidence before the Magistrate has been limited to a determination that there was competent evidence supporting the finding of extraditability.

*Valencia v. Limbs,* 655 F.2d 195, 197 (9th Cir.1981). The magistrate's probable cause finding "must be upheld if there is any competent evidence in the record to support it." *Quinn,* 783 F.2d at 791. *See also Peters v. Egnor,* 888 F.2d 713, 717 (10th Cir.1989).

■ It is clear from Magistrate Alexander's exhaustive discussion of probable cause in her August 24, 1989, Order that the record contains more than sufficient evidence to support her finding of probable cause.[13] Nevertheless, Koskotas challenges probable cause determinations for the Irving Trust and the Merrill Lynch misappropriations and the Merrill Lynch forgery charges.[14]

13. The parties debate whether the applicable probable cause standard is federal or state. Although the point does not change the outcome, I will address it briefly.

Article I of the Treaty provides:

, Surrender shall take place only upon such evidence of criminality, as according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial if the crime or offense had been there committed.

Koskotas argues that the "place where the fugitive or person so charged shall be found" is Massachusetts, and thus that the Massachusetts "directed verdict" standard must be applied ("the judge or magistrate should view the proceeding as if it were a trial and should find probable cause only if the Commonwealth has presented sufficient evidence to send the case to a jury." *Commonwealth v. Ortiz,* 393 Mass. 523, 534 n. 13, 471 N.E.2d 1321 (1984)). Koskotas cites *Romeo v. Roache,* 820 F.2d 540, 545 (1st Cir.1987) (construing a similar clause in the United States/Canada Extradition Treaty to mean that Massachusetts law applies) as authority for the application of Massachusetts law. Magistrate Alexander apparently believed that the United States agreed. Order of August 24, 1989, at 21.

The United States, however, contends that the Magistrate misconstrued its position, which is that the probable cause standard is set by federal law. Although it briefed both standards, the Government notes that a Protocol issued by the two countries sets forth a federal standard, and that cases such as *Quinn* and *Russell* support application of the federal standard since extradition proceedings are not intended to be full-blown trials. The United States also notes that the First Circuit applied the federal standard in *Greci v. Birknes,* 527 F.2d 956, 958 (1st Cir.1976) (interpreting the United States/Italy Extradition Treaty). The *Greci* court noted that the treaty language had been. changed from that parallel .to the United States/Greece Treaty to different wording, contemplating "that the change would ensure that [the construction applying state law] would not be carried forward and that uniform federal law be applied." *Id.* at 959. I find the Protocol between the United States and Greece served the same purpose and conclude that a federal standard is the proper measure of probable cause in the United States/Greece Treaty.

In any event, the debate is essentially irrelevant in this proceeding. The Magistrate applied the stricter, Massachusetts standard and *still* found probable cause. I find her determination adequately supported. Because probable cause was found under the stricter state standard, it must necessarily be found under the federal standard.

14. Because I have concluded that the travel documents fraud offense is not *extraditable* and because Koskotas does not seem to contest probable cause as to the Bank of Crete embezzlement, I will not consider in depth the Magistrate's probable cause determinations as to them. It suffices to note that the Magistrate's

■ Koskotas argues that a January, 1989 audit of the Bank of Crete undermines the misappropriation charges by showing that the Bank never had the allegedly misappropriated funds in the United States. He notes that the Greek government failed to include the audit report in its submission of evidence. He alleges that the "charge was based on the circumstantial facts that (1) the Bank's records reflected large United States deposits in two institutions here, and (2) those institutions had confirmed that Bank of Crete deposits of that size did not exist. Now, however, the Bank of Crete has confirmed that it *never* had such sums in this country." [15]

■ Koskotas also argues that the charge of altering a Merrill Lynch account statement—the Merrill Lynch Forgery— has not been supported by evidence on all elements; specifically, he claims that the evidence suggests a purpose to defame whereas the offense requires a purpose to defraud.[16] He notes that the witness statements aver the Merrill Lynch statement was forged for the purpose of defaming certain public officials, that the warrant charges aggravated defamation (a non-extraditable offense) as well as forgery, and that the victim complaints protest injury to reputation rather than that the victims were defrauded as to facts with legal significance. He suggests that the Magistrate simply adopted the theory of the Greek public prosecutor—that Koskotas "forged ... with the intent of misleading others to believe that five individuals maintained accounts at Merrill Lynch with the intent to enrich himself by obstructing the investigation and prosecution of him" [17]—without any evidence to support that theory.

In response to Koskotas' attack, the United States argues that the Magistrate had ample competent evidence upon which to base the finding of probable cause. The United States suggests that Koskotas is trying to contradict the evidence of probable cause, whereas at the magistral hearing he was permitted only to explain the government's evidence and now on petition for a writ of habeas corpus he is permitted only to question the existence of *any* competent evidence.

As the United States suggests, Koskotas will be free at his trial in Greece to use the audit to argue the technical defense "that he did not embezzle any money held in Irving Trust or Merrill Lynch but rather only used the accounts to conceal his other embezzlements from the Bank of Crete." [18] Reviewing the Magistrate's August 24, 1989, Order, there plainly was ample evidence on which to rest the probable cause determination as to the misappropriation charges.

The Merrill Lynch forgery charge presents a somewhat different issue. Koskotas appears to be correct that the Magistrate rested her determination of probable cause largely, although not entirely, on the warrants themselves and on the statement of the public prosecutor.[19] Little direct evidence of Koskotas' intent was presented, but the Magistrate inferred from that evidence that Koskotas used the forged document on at least two occasions to mislead others, so that the elements of forgery had been made out. As the Magistrate noted, the fact that the complaining witnesses claimed defamation does not mean that the elements of the forgery charge are lacking. *Koskotas*, 127 F.R.D. at 24. Competent evidence supports the Magistrate's probable cause determination as to the Merrill Lynch Forgery charge, although Koskotas will be free to contest the

---

probable cause determinations as to those charges were well-founded.

**15.** Petition at 96.

**16.** In Greece, forgery and use of forgery (Crim. Code of Greece Articles 216(1) and (2)) requires:
 1. One who executes a forged document or one who alters a document, or who uses the same;
 2. With intent to use it to defraud another;
 3. Concerning a fact which has legal significance.

**17.** *Koskotas,* 127 F.R.D. at 24.

**18.** Government's Answer at 28.

**19.** *See* Order of August 24, 1989, at 29–31.

inferences to be drawn at his trial in Greece.

Thus, I find the record contains evidence sufficient to support the Magistrate's determinations of probable cause.

## VII

### *Other Matters*

As discussed in Section III, on habeas review of a magistrate's certificate of extradition, the court's inquiry should be limited to whether the offenses charged are within the applicable treaty and whether any evidence supports the magistrate's probable cause determination. In Sections IV–V, I found the offenses charged to be within the Treaty, with the exception of the travel documents fraud charge. In Section VI, I found that there is evidence to support the Magistrate's determinations of probable cause.

In addition, Koskotas presses two more unusual arguments for granting permanent habeas relief—(A) procedural irregularities and (B) equitable principles. If those arguments fail, he also raises several grounds for contingent or temporary habeas corpus relief—(C) a discovery request, (D) a plea for bail, and (E) a request that extradition be stayed.

### A. *Alleged Procedural Irregularities*

A common theme in Koskotas' Petition is that procedural irregularities and 'unfair' rulings have denied him due process and fundamental fairness. As a general matter, it appears to be appropriate for the habeas court to review due process concerns; the First Circuit has recently recognized "that serious due process concerns may merit review beyond the narrow scope

of inquiry in extradition proceedings." *Manzi*, 888 F.2d at 206 (citations omitted). However, to warrant review, the petitioner must "raise fundamental issues of substantive or procedural due process." *Id.*

■■■■ Koskotas raises two types of procedural concerns: (1) he alleges that the United States did not meet its obligations regarding provisional arrest and submission of evidence, and (2) he recasts his other arguments (regarding bail, the New York order freezing his assets, discovery, and evidence he could not present at hearing) as due process issues. As to the second type of concern, no extended discussion is necessary.[20] The first type of concern, however, requires some discussion.

■■■ Koskotas argues that procedural requirements were violated because the charges which ultimately provided the basis for the Magistrate's determination were not the grounds for his provisional arrest in November, 1988. In November, the government requested Koskotas' provisional arrest based on one misidentified Greek warrant. At that time, two warrants had issued for Mr. Koskotas. By January 20, 1989, two more warrants had issued against him and the government presented proof and requested extradition on that day regarding all four warrants. Koskotas further complains that the United States did not formally request his provisional arrest pursuant to all four warrants until March 20, 1989, the same date the government presented "supplemental" evidence. This supplemental evidence, Koskotas complains, should not have been received because it was after the Treaty's 60–day deadline for submission of evidence.[21]

---

**20.** Koskotas complains that he was denied his liberty and the financial resources to defend himself, hampering his defense. Based on the voluminous pleadings submitted on his behalf, I find Koskotas has not suffered inadequate representation. Koskotas also complains that he was denied any discovery, but he neither has a right to present defenses at the extradition phase, nor was discovery required here. *See generally* Section VII.C., *infra*. Finally, he argues that he was denied his right to present evidence "explanatory" in nature; however, the evidence Koskotas claims he could not present,

*see* Petition at 33, was ruled by the Magistrate to be contradictory rather than explanatory, and, I find, was properly excluded on those grounds.

**21.** Article XI of the Treaty provides that the "person provisionally arrested, shall be released, unless within two months of ... the date of commitment in the United States, the formal requisition for surrender with the documentary proves hereinafter prescribed be made as aforesaid by the ... demanding government.... If ... the fugitive is merely charged with crime, a duly authenticated copy of the warrant of arrest

The United States responds that nothing precludes submission of additional evidence after the 60–day period, that extradition treaties are to be liberally construed, that most of the supplementary materials are either found in public records or reinforce previously submitted evidence, and that "neither the Treaty nor any other provision of law requires that the first warrant enumerate all of the extraditable offenses committed by Koskotas." [22]

I find that the concerns raised cannot be deemed "substantial." Koskotas had notice of the charges against him for which extradition would be sought, he received the bulk of the evidence supporting those charges within two months of his arrest and supplementary evidence more than two months before his hearing. "[T]here is no obligation on the requesting state to set forth all its evidence or indeed to wait until its investigation is complete before making the request [for extradition]." *Restatement (Third) of the Foreign Relations Law of the United States* § 477 comment c (1987). Thus, I find that no "serious" due process concerns have been implicated, and I decline to grant habeas relief on that basis.

### B. *The Equities—The Federal Court's Sense of Decency*

■■■ Koskotas repeatedly argues that Greece is seeking to prosecute him on the basis of illicit political motives and that terrorists will assassinate him if he is returned to Greece. He argues that "quite apart from whether the crimes themselves were political, the Court also is permitted to examine the motives of the Greek government, the procedures used, and the likely consequences to Mr. Koskotas, to determine whether they are 'antipathetic to a federal court's sense of decency.' " [23]

Koskotas bases this argument on the court's supervisory authority and on the Second Circuit's observation that it "can imagine situations where the relator, upon extradition, would be subject to procedures or punishments so antipathetic to a federal court's sense of decency as to require reexamination of [the rule of non-inquiry]." *Gallina v. Fraser*, 278 F.2d 77, 79 (2nd Cir.), *cert. denied*, 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960). *See also Ahmad v. Wigen*, 726 F.Supp. 389, 409–16 (E.D.N.Y. 1989). He also references Article V of the Treaty [24], and suggests that because outrageous government conduct can bar prosecution, Koskotas would not be subject to prosecution under the laws of this country.

On close examination, Koskotas' argument carries little weight. The electoral transitions in Greek government undermine any improper motives contention, even were it to be considered, and the contention regarding threat of death, even were it to be considered, has an extra-governmental source. In any event, the argument need not and should not be considered. It is not the business of courts to inquire into the motives of a requesting country—a matter which is in the executive's realm of foreign affairs. "[I]t is clear that the Secretary of State has sole discretion to determine whether a request for extradition should be denied because it is a subterfuge made for the purpose of punishing the accused for a political crime." *Quinn*, 783 F.2d at 789.

Moreover, as the First Circuit recently noted, the federal courts traditionally

> have refused to consider questions relating to the procedures or treatment that might await an individual on extradition.... Courts have chosen to defer these questions to the executive branch because of its exclusive power to conduct foreign affairs.... Furthermore, courts have applied this rule where an individu-

in the country where the crime was committed, and of the depositions upon which such warrant may have been issued, shall be produced, with such other evidence of proof as may be deemed competent in the case."

**22.** Government's Answer at 77.

**23.** Petition at 72.

**24.** "A fugitive criminal shall not be surrendered under the provisions hereof, when, from lapse of time or other lawful cause, according to the laws of either of the surrendering or of the demanding country, the criminal is exempt from prosecution or punishment for the offense for which the surrender is asked."

al facing extradition has questioned a foreign country's ability to provide adequate safety and protection.

*Manzi*, 888 F.2d at 206 (citations omitted). Thus, although Koskotas is free to raise Greece's allegedly illicit motives and the physical threat to his life with the Secretary of State, the courts are not the proper forum for consideration of those matters.

I decline to grant equitable relief based on antipathy to the court's sense of decency.

### C. *Discovery Requests*

Koskotas attempted to conduct discovery during the proceedings below, but Magistrate Alexander denied his discovery motions in her July 13, 1989, Order. *Koskotas*, 127 F.R.D. at 28–29. Koskotas now renews his claim that he should be allowed to conduct discovery, arguing that denial of discovery amounts to denial of due process and his right to a fair hearing. As the Ninth Circuit has succinctly summarized,

> Although there is no explicit statutory basis for ordering discovery in extradition hearings, the extradition magistrate has the right, under the court's "inherent power," to order such discovery procedures "as law and justice require." In exercising discretion, the magistrate should consider both "the well-established rule that extradition proceedings are not to be converted into a dress rehearsal trial," and whether the resolution of the contested issue would be appreciably advanced by the requested discovery. Although the accused is not entitled to introduce evidence that goes to his defense, "he may offer limited evidence to explain elements in the case against him." Needless to say, a habeas court can determine whether the magistrate's decision to deny discovery constituted an abuse of discretion that deprived the accused of due process.

*Quinn v. Robinson*, 783 F.2d at 817 n. 41 (citations omitted).

Koskotas argues that the discovery he seeks is necessary in order for him to obtain evidence "*explaining* why no probable cause exists to support the charges leveled by Greece," showing that the offenses charged are political in character, supporting the time-barred nature of the travel documents fraud charge, and demonstrating that he will be exposed to procedures of punishment antipathetic to a federal court's sense of decency.[25] He also argues that his right to a fair hearing entitles him to discover information exculpatory in nature. Finally, he suggests that since the Southern District of New York allowed Greece to obtain discovery via letter rogatory in the *Bank of Crete* litigation, fundamental fairness "requires that Mr. Koskotas have the same opportunity as the Greek government to obtain discovery by way of letter rogatory."[26]

Of these arguments, only one requires any extended discussion: the possible use of discovery to explain the absence of probable cause. Briefly, as to the others: I fail to see what evidence on the political offense issue is not already available to Koskotas and the court; I have already determined that the travel documents fraud charge is not suitable for extradition; *Manzi* seems to render Koskotas' fear of bad treatment in Greece a matter for State Department (and not judicial) concern; since extradition hearings ought not serve as dress rehearsals for trial, fairness requires only the opportunity to present explanatory evidence, not exculpatory evidence; and neither due process nor 'fundamental fairness' require parity with the discovery allowed in a civil matter in another jurisdiction.

As to the use of discovery to develop evidence explaining a lack of probable cause, Magistrate Alexander noted that

> Koskotas fails to delineate how any of the information sought in his 38 discovery requests will assist him in ex-

**25.** Petition at 111–112.

**26.** Petition at 115. Koskotas also argues that the Southern District exceeded its statutory authority in issuing the letter; this argument is irrelevant here. The propriety of the letter rogatory process is a matter for the Southern District and raises no serious due process concern in this proceeding.

plaining the government's evidence. Koskotas' overly broad requests for discovery are unprecedented and unsupported by the relevant case law.

Accordingly, this Court declines to use its discretionary authority to allow Koskotas to convert this proceeding into a trial on the merits, in contravention of the nature and purpose of the extradition treaty, and hereby denies Koskotas' motion for discovery and inspection.

*Koskotas,* 127 F.R.D. at 29. The Magistrate neither abused her discretion nor denied Koskotas due process in reaching this conclusion. Koskotas continues to fail to delineate how the information he seeks would demonstrate a lack of probable cause. At most, he seeks contradictory evidence which cannot properly be presented in this proceeding.

I decline to grant relief from the Magistrate's ruling on discovery.

### D. *Bail*

Koskotas continues his efforts to be released on bail, which have been thwarted by Magistrate Alexander at every phase of the extradition proceedings; he now seeks review of the Magistrate's rulings on this issue via prayer for "temporary" habeas relief granting him bail until the extradition proceedings have been thoroughly completed. "[H]abeas review of a bail determination by a Magistrate prior to an extradition hearing is permissible and appropriate [based on several First Circuit cases].... [However,] the scope of habeas review for such determinations is 'very narrow.' ... Thus, the Court will only inquire ... whether there were reasonable grounds for the Magistrate's findings ordering no bail." *Matter of Extradition of Russell,* 647 F.Supp. 1044 (S.D.Tex.), *aff'd,* 805 F.2d 1215 (5th Cir.1986).

"[B]ail should not ordinarily be granted in cases of foreign extradition." *Wright v. Henkel,* 190 U.S. 40, 63, 23 S.Ct. 781, 787, 47 L.Ed. 948 (1903). "In a case involving foreign extradition, bail should not be granted absent 'special circumstances.'" *United States v. Williams,* 611 F.2d 914

(1st Cir.1979) (quoting *Wright v. Henkel*). "Special circumstances" have been limited to situations where 'the justification is pressing as well as plain,' ... or 'in the most pressing circumstances, and when the requirements of justice are absolutely peremptory.' ... Such circumstances may include a delayed extradition hearing, ... and the need of the defendant to consult with his attorney in a civil action upon which his 'whole fortune' depends.... In contrast, the discomfiture of jail, ... and even applicant's arguable acceptability as a tolerable bail risk ... are not special circumstances.

*United States v. Williams,* 611 F.2d at 915 (citations omitted).

Koskotas argues that the following circumstances are "special" and thus justify his release on bail:

1) His need to be actively involved in counsel's preparation for the extradition proceedings;

2) His pro se defense of the civil action in New York which would "deprive him of all or almost all of his assets;" and

3) His willingness to submit himself to house arrest, and the alleged absence of "significant risk of flight" due to his voluntary presence in the U.S. to protect himself and his family.

As the United States notes, neither circumstance # 1 nor circumstance # 3 can constitute "special circumstances," even if they are taken as true; every detainee would prefer to be free to assist counsel, and many detainees can argue that they are at low risk of flight. Thus, I consider only circumstance # 2.

In *In re Mitchell,* 171 F. 289 (S.D. N.Y.1909), then District Judge Learned Hand granted an extradition detainee bail where confinement would have prevented his participation in a civil case involving "a very large sum of money ... indeed, ... it involve[d] all the fortune of the prisoner." *Id.* However, Mitchell was granted bail only for the duration of the trial. By contrast, "[t]his is not a situation where, as was true in *In re Mitchell, supra,* Petitioner faces being arrested on the eve of a complex civil trial upon which his whole

fortune depends." *Matter of Extradition of Russell*, 647 F.Supp. at 1049. Although the *Bank of Crete* case may be complex litigation upon which Koskotas' fortune depends, there is no evidence that we are on the eve of trial. "Ample time remains for Petitioner to consult with his attorneys as to that pending litigation." *Id.*

Of course, Koskotas argues that he has no attorneys with whom to consult, and that he must prepare the litigation himself. Given the special appearances filed by three prominent firms, however, this argument seems to stretch the bounds of credibility. Moreover, Koskotas is free to petition for amendment of the restraining order freezing his assets in order to access legal fees. Indeed, $1.4 million has already been released. *Bank of Crete, S.A. v. Koskotas*, 733 F.Supp. 648, 655 (S.D.N.Y.1990). The submissions of the parties amply demonstrate Judge Wood's sensitivity to the need for adequate representation in that proceeding.

Given Koskotas' status as a fugitive from justice (who fled initially to a country not honoring extradition with Greece), given his belief that a return to Greece will mean death, and given the showing that—despite his incarceration—Koskotas has not received anything less than full development and consideration of his contentions in the various proceedings to which he is a party, there are "reasonable grounds" for denying bail. In the absence of evidence that the civil case is about to go to trial, special circumstances do not exist to justify his release. Accordingly, I share the Magistrate's finding that bail is not proper in this matter.

### E. *Request for a Stay*

In the event that he cannot obtain regular habeas relief, Koskotas prays for a stay of his extradition—a "contingent" writ. He presents essentially four reasons why a stay is needed:

(1) His defense of the criminal prosecution in the Southern District of New York;

(2) His defense of the civil matter in the Southern District of New York;

(3) The additional information needed for his defense that will emerge from former Prime Minister Papandreou's libel action against *Time* Magazine; and

(4) The additional information needed for his defense that will emerge from the parliamentary proceedings regarding former PASOK government officials.

He also cites the need to complete discovery for these extradition proceedings as a reason to stay extradition. I have, however, already concluded discovery is not appropriate here. *See* Section VII.C., *supra.*

Koskotas suggests that the authority to stay extradition proceedings is the same as the court's general authority to grant stays.

A court's right to stay proceedings is inherent in its power to control its own docket. *Landis v. North American Co.*, 299 U.S. 248, 254 [57 S.Ct. 163, 165, 81 L.Ed. 153] (1936); *Harmon Kardon, Inc. v. Ashley Hi–Fi*, 602 F.2d 21, 23 (1st Cir.1979). The determination of whether to grant a stay "calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Landis*, 299 U.S. at 254–255 [57 S.Ct. at 165–66].

*Amersham International v. Corning Glass Works*, 108 F.R.D. 71, 71–72 (D.Mass.1985) (parallel citations omitted). Koskotas argues that here a stay would "conserve judicial resources, lead to a narrowing or simplification of the issues, further the interests of justice in several important respects, and greatly assist this court in determining many of the legal questions presented—all without causing 'hardship' to the government of Greece. . . . Denial of the requested stay would, on the other hand, cause real hardship to Mr. Koskotas and jeopardize his right to a fair hearing—without advancing any legitimate countervailing interest of the government of Greece." [27]

 I agree with the Magistrate that— given the "heavy burden required to sus-

---

**27.** Petition at 117–118.

tain a stay motion".[28]—Koskotas' rationales # 3 and # 4 are without merit; the pendency of civil and parliamentary proceedings in other countries, to which Koskotas is not a party, are insufficient to justify a stay of this or, for that matter, any other judicial proceedings. However, the pending American civil case against Koskotas might—and the criminal case against him did—represent cognizable bases for a stay.

Had the criminal prosecution not been dropped (upon instructions by the Department of Justice because of foreign policy concerns regarding the need to expedite this extradition proceeding), grounds for a stay were available in the Treaty itself. Article VI of the Treaty provides that when

a fugitive criminal whose surrender may be claimed pursuant to the stipulations hereof, be actually under prosecution, out on bail or in custody, for a crime or offense committed in the country where he has sought asylum, or shall have been convicted thereof, his extradition may be deferred until such proceedings be determined, and until he shall have been set at liberty in due course of law.

Thus, if the criminal prosecution had not been dropped and his bail bond released (though now attached in the civil case), Koskotas' extradition might have been deferred pursuant to the Treaty.

■ Assuming that the pending civil action might provide grounds for a stay of a judicial proceeding generally, I must address the question of the court's inherent authority to issue such a stay in this particular type of proceeding. The United States argues that extradition is not analogous to other court proceedings, and that only the Executive Branch can defer extradition.[29] I am satisfied that the government is correct. In an opinion by Judge Friendly, the Second Circuit rejected a similar plea for a stay of extradition based on the pendency of numerous American civil and criminal

proceedings. The court held that such arguments for a stay of extradition "are properly addressed to the executive branch, which is empowered to make the final decision on extradition and has assumed the discretion to deny or delay extradition on humanitarian grounds." *Sindona v. Grant*, 619 F.2d 167, 176 (2nd Cir.1980) (citations omitted).

Because the authority to stay extradition in these circumstances appears to rest properly with the executive branch rather than with the courts, and because in any event I find no compelling basis to issue a stay, even if I have the power to do so, I decline to issue a stay of extradition.

## VIII

### *Remedy*

■ Having found that Koskotas is extraditable to Greece on the Irving Trust Misappropriation Charges, the Merrill Lynch Misappropriation Charges, the Bank of Crete Embezzlement Charges and the Merrill Lynch Forgery Charges, but not on the Travel Documents Fraud Charge, I must address the question of remedy. As a habeas corpus judge, I may not alter the Magistrate's certification to the Secretary of State. *Shapiro v. Ferrandina*, 478 F.2d 894, 914 (2nd Cir.), *cert. dismissed*, 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973). The settled method of implementing the determinations I have made in this Memorandum is through the "cumbersome method of disposition," *Sindona v. Grant*, 619 F.2d 167, 180 (2nd Cir.1980), known as contingent habeas corpus relief. Thus, I will order that the Magistrate's *Certification of Extraditability and Order on Extradition* entered August 24, 1989, be modified to provide for petitioner's discharge within 30 days unless Magistrate Alexander or some other Magistrate designated

---

**28.** *Amersham International,* 108 F.R.D. at 72.

**29.** *See, e.g.,* I.M. BASSIOUNI, II INTERNATIONAL EXTRADITION chapter IX at 601–602 (2d Ed.1987) ("The Executive, and in particular the President, conducts foreign affairs, and since the delivery or receipt of a request is to or from another sovereign, it is within the constitutional province of the Executive branch.... The Executive branch has discretion in surrendering a relator found extraditable, the conditions of his surrender, and subsequent treatment.").

under 18 U.S.C. § 3184 certifies extraditability in accordance with this Memorandum.